**TEAMSTERS LOCAL 372, DETROIT MAILERS UNION LOCAL 2040; Newspaper Guild of Detroit Local 22; GCIU Local 289, Graphic Communications International Union; GCIU Local 13N, Graphic Communications International Union; Detroit Typographical Union Local 18, Communications Workers of America, Plaintiffs and Counter–Defendants,**

v.

**DETROIT NEWSPAPERS, Defendant and Counter–Plaintiff,**

**Asset Protection Team, Inc.; Huffmaster Associates, Inc.; City of Sterling Heights; Thomas Derocha, Individually and as Chief of Police of Sterling Heights; and Steve Duchane, Individually and as City Manager of Sterling Heights, Defendants,**

**United Auto Workers Doe Defendants, Counter–Defendants.**

**Civil Action No. 95–40474.**

United States District Court,
E.D. Michigan,
Southern Division.

Feb. 24, 1997.

Samuel C. McKnight, John R. Canzano, Klimist, McKnight, Sale, McClow & Canzano, Southfield, MI, Elizabeth A. Grdina, International Brotherhood of Teamsters, Legal Department, Washington, DC, Stuart M. Israel, Miller, Cohen, Martens, Ice & Geary, P.C., Southfield, MI, William A. Wertheimer, Jr., William Wertheimer Assoc., Royal Oak, MI, Mark H. Cousens, Mark H. Cousens Assoc., Southfield, MI, for Teamsters Local 372, Detroit Mailers Union Local 2040, Newspaper Guild of Detroit Local 22, Graphic Communications International Union Local 289, Graphic Communications International Union Local 13N, and Detroit Typographical Union Local 18, Communications Workers of America.

Robert J. Battista, Leonard M. Niehoff, Robin K. Luce, and Butzel Long, Detroit, MI, for Detroit Newspapers.

Theodore R. Opperwall, Dickinson, Wright, McKean & Cudlip, Bloomfield Hills, MI, and William J. Dempster, Holland & Knight, Washington, DC, for Vance International, Incorporated.

Theodore R. Opperwall, Dickinson, Wright, McKean & Cudlip, Bloomfield Hills, MI, William J. Dempster, Richard O. Duvall, and Edward V. Hickey, Holland & Knight, Washington, DC, for Asset Petroleum Team, Incorporated.

Albert B. Addis, Gagleard, Addis & Imbrunone, Royal Oak, MI, for Huffmaster Associates, Incorporated.

Bert T. Ross, O'Reilly, Rancilio, Nitz, Andrews & Turnbull, P.C., Sterling Heights, MI, for Sterling Heights, City of, Thomas Derocha, and Steven Duchane.

### MEMORANDUM OPINION AND ORDER GRANTING, IN PART, AND DENYING, IN PART, PLAINTIFFS/COUNTER–DEFENDANTS MOTION, PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6), TO DISMISS AMENDED COUNTERCLAIM OF DETROIT NEWSPAPERS.

GADOLA, District Judge.

Before the court is plaintiffs/counter-defendants', Detroit Mailers Union Local 2040, Teamsters Local 372, Newspaper Guild Local 22, GCIU Local 289, GCIU 13N, and Detroit Typographical Union Local 18 ("Unions"), motion to dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(6), the amended counterclaim of the defendant/counter-plaintiff, Detroit Newspaper Agency ("DNA"). This court heard oral argument on January 22, 1997. For the reasons set forth below, this court will grant, in part, and deny, in part, the Unions' motion to dismiss.

## I. PROCEDURAL BACKGROUND

This case arises from the labor strike against the Detroit Newspaper Agency which first began on July 13, 1995. Plaintiffs are

six unions: Teamsters Local 372; Detroit Mailers Union Local 2040; Newspaper Guild of Detroit Local 22; GCIU Local 289, Graphics Communications International Union; GCIU Local 13N, Graphics Communications International Union; and Detroit Typographical Union 18, Communications Workers of America. Defendants are Detroit Newspaper Agency; Vance International, a private security firm; Asset Protection Team ("APT"), a private security company which is a subsidiary of defendant Vance; Huffmaster Associates, Inc., a private security firm; the City of Sterling Heights; Sterling Heights Police Chief Thomas Derocha; and Sterling Heights City Manager Steven Duchane. The Unions allege that the DNA had contracts with the three private security firms for security services.

In Count I of their complaint, filed October 2, 1995, the Unions sue under 42 U.S.C. § 1983, alleging that the defendants engaged in a conspiracy to violate their rights under the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151 *et seq.* In Count II, the Unions sue under 42 U.S.C. § 1983 for an alleged conspiracy to violate their First, Fourth, and Fourteenth Amendment rights. The Unions claim that they engaged in conduct protected by the NLRA, including their rights to strike, to engage in concerted activity in support of their strike, to engage in concerted activity in support of their strike, to engage in peaceable assembly, and to picket. In response to this conduct, the Unions allege, the defendants conspired to enforce laws against the DNA; harassed striking union members; conducted unlawful searches and seizures of striking union members; unlawfully arrested union members and their sympathizers; used excessive and unreasonable force to detain and/or arrest union members and sympathizers; failed to take action to secure the safety of union members; and failed to investigate and stop the defendants' employees who engaged in unlawful conduct. In Count III, the Unions allege a state law claim for conspiracy and violations of the Michigan Constitution. Plaintiffs seek injunctive relief and compensatory and punitive damages.

Defendant Detroit Newspaper Agency filed a counterclaim on November 15, 1995, alleging that the Unions violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), and conspired to violate § 1962(d). In Count I, the DNA alleges that the Unions engaged in extortion and physical and verbal threats of extortion directed at DNA independent contractors, employees, and vendors; robbery resulting from theft of newspapers from subscribers, vendors, distribution racks, drop spots, and independent contractors; and arson by setting fire to and/or bombing vehicles at DNA facilities, placing and/or igniting pipe bombs in news racks, and throwing incendiary and explosive devices at and onto DNA property and/or at individuals working for DNA. Count Two alleges that the Unions conspired with and aided and abetted one another to accomplish the pattern of racketeering activity described in Count One.

The six unions filed four motions to dismiss the counterclaim pursuant to Federal Rule of Civil Procedure 12(b)(6) on February 12, 1996. On April 2, 1996 Judge Friedman, to whom this case was originally assigned, denied the various motions to dismiss and ordered the DNA to file a more detailed counterclaim and RICO case statement. The DNA complied with this request and filed an amended counterclaim alleging 248 predicate acts in support of its RICO claim. On August 9, 1996, the six plaintiff unions filed this joint motion to dismiss the defendants' amended RICO counterclaim. October 24, 1996, the case was reassigned to this court. This court held a status conference on December 19, 1996. On January 21, 1997, DNA supplemented the original RICO case statement by alleging an additional 11 predicate acts bringing the total alleged predicate acts to 259. Oral argument on the instant motion was heard on January 22, 1997.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) authorizes the district courts to dismiss any complaint (or counterclaim) which fails "to state a claim upon which relief can be granted." Rule 12(b)(6) affords plaintiff/counter-defendant unions an opportunity

to test whether, as a matter of law, the defendant/counter-plaintiff DNA is entitled to legal relief on its counterclaim against plaintiff/counter-defendant unions even if everything alleged in the counterclaim is true. In applying the standards under Rule 12(b)(6), the court must presume all well-pleaded factual allegations in the counterclaim to be true and draw all reasonable inferences from those allegations in favor of the non-moving party. *Mayer v. Mylod,* 988 F.2d 635, 638 (6th Cir.1993); *Miller v. Currie,* 50 F.3d 373, 377 (6th Cir.1995). The court need not, however, accord the presumption of truthfulness to any legal conclusion, opinions or deductions, even if they are couched as factual allegations. *Western Mining Council v. Watt,* 643 F.2d 618, 629 (9th Cir.1981); *Mitchell v. Archibald & Kendall, Inc.,* 573 F.2d 429, 432 (7th Cir.1978); *Sexton v. Barry,* 233 F.2d 220, 223 (6th Cir.1956). Dismissal for failure to state a claim is disfavored:

> [A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

*Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). *See also Cameron v. Seitz,* 38 F.3d 264, 270 (6th Cir.1994) (stating that a motion to dismiss should be denied unless "it is clear that the plaintiff can prove no set of facts in support of [its] claim that would entitle [it] to relief.").

### III.  APPLICABLE LAW

■ In 1935, the National Labor Relations Act (the "NLRA") was enacted by Congress as a broad statutory scheme designed to facilitate industrial peace. The NLRA immunized peaceful strike conduct from federal and state court action, and granted the National Labor Relations Board (the "NLRB") exclusive jurisdiction over labor-management disputes pertaining to wages, hours, and other conditions of employment. The NLRA is remedial and not punitive, thus leaving federal and state courts to respond to civil and criminal matters that arise from, but are in

some way independent of, the underlyi. labor dispute.

In 1970, Congress enacted the Racketeer Influenced and Corrupt Organizations Act ("RICO") to assist the federal government in stemming the growth of organized crime. RICO provides criminal sanctions as well as civil remedies for a private plaintiff whose business or property is injured by violations of the statute. Specifically, the relevant section of RICO states the following:

> It shall be unlawful for any person by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity ... 18 U.S.C. § 1962(c) (1982).

The statute also prohibits any person to conspire to violate any of the substantive provisions of the above section. *See* 18 U.S.C. § 1962(d) (1982).

RICO and the NLRA are independent of each other in virtually all respects, even though certain conduct by employers or by unions could fall within the bounds of both statutes. One of the issues that arises in this motion to dismiss is whether Congress intended RICO to reach conduct that arguably amounts to unfair labor practice, which otherwise falls within the exclusive jurisdiction of the NLRB, and if so to what extent. The statutes can, however, be reconciled without the goals of either Act being ignored by looking to the type of injury a plaintiff alleges and to the defendant's conduct to determine whether the NLRA or RICO provides the appropriate remedy.

### IV.  DISCUSSION

The Unions make six separate arguments in support of their motion to dismiss.

#### A.  Preemption

The Unions' first argument in support of dismissal is based on preemption. The Unions contend that many of the DNA's 259 [1] alleged predicate acts are preempted by the

---

**1.** Although the Unions have not specifically responded to the DNA's supplemental RICO case

statement, this court will presume their opposition to the same.

NLRA.[2] Any analysis regarding NLRA preemption of RICO must necessarily begin with the Supreme Court decision in *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959). In *Garmon*, the Court held that "[w]hen an activity is arguably subject to § 7 or § 8 of the [NLRA], the States as well as the federal court, must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted." *Id.* at 245, 79 S.Ct. at 780. *See also Amalgamated Ass'n of Street, Elec. Ry. & Motor Coach Employees v. Lockridge*, 403 U.S. 274, 276, 91 S.Ct. 1909, 1913, 29 L.Ed.2d 473 (1971) (stating that NLRA "pre-empts state and federal court jurisdiction to remedy conduct that is arguably protected or prohibited by the Act.").

■ With the advent of civil RICO, however, an inevitable conflict developed between RICO and the NLRA. One of the earliest and most influential opinions addressing this conflict was issued in *Butchers' Union Local, No. 498 v. SDC Inv., Inc.*, 631 F.Supp. 1001 (E.D.Cal.1986). The *Butchers' Union* court held that to determine whether a RICO claim was preempted by the NLRA, it would have to look at the nature of the underlying predicate act. Where the defendant's alleged predicate offense is only unlawful because it is proscribed by the labor laws, the RICO claims are preempted by the NLRA. *Id.* at 1010–11.

■ Since *Butchers' Union*, this area of the law remains somewhat muddled. Federal courts which have addressed the preemption issue have adhered to the *Garmon* preemption doctrine. There are, however, three exceptions to the doctrine which usurp the NLRB's primary jurisdiction. The *Garmon* preemption doctrine does not apply if: (1)

Congress has expressly carved out an exception to the NLRB's jurisdiction; (2) the regulated activity is merely a peripheral concern of the labor laws; or (3) the regulated activity touches interests deeply rooted in local feeling and responsibility. *Vaca v. Sipes*, 386 U.S. 171, 179–80, 87 S.Ct. 903, 910–12, 17 L.Ed.2d 842 (1967). *Accord, Tamburello v. Comm–Tract Corp.*, 67 F.3d 973, 977–78 (1st Cir.1995); *Brennan v. Chestnut*, 973 F.2d 644, 646 (8th Cir.1992). Accordingly, this court will find that *Garmon* preemption is invoked unless one of the above exceptions is applicable.

■ As to the first exception, the only labor-related "racketeering" activity expressly listed as predicates to liability under RICO are actions concerning restrictions of payments and loans to labor organizations, or those relating to embezzlement from labor funds. *Tamburello*, 67 F.3d at 977 (citing 29 U.S.C. § 186). Since the DNA does not allege § 186 violations, the first exception does not apply.

■ Taken out of order, the third exception likewise does not apply in the instant case because the relationship between two federal laws, i.e. RICO and the NLRA, is implicated as opposed to a state and a federal law. *Tamburello*, 67 F.3d at 973.

■ The second exception, however, arguably applies to a great many of the predicate acts that have been alleged. For instance, DNA's extortion allegations arguably establish violations of both RICO and the NLRA, to wit: extortion on the one hand, and unfair labor practices on the other. *See Tamburello*, 67 F.3d at 978. To determine whether these acts are merely peripheral or collateral to the labor laws, this court must look to the

---

**2.** Some courts have held that "preemption," which has its genesis in the Supremacy Clause, is only implicated where the NLRA conflicts with a state statute, and not where its relationship is with another federal statute such as RICO. *See, e.g., Hood v. Smith's Transfer Corp.*, 762 F.Supp. 1274, 1282–83 (W.D.Ky.1991); *Gregory v. American Guild of Musical Artists*, No. 91 Civ 6751 (SWK), 1993 WL 179110 (May 24, 1993 S.D.N.Y.). That position, however, appears to be the minority view. Most courts agree that the *Garmon* doctrine, which was developed in *San*

*Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 244, 79 S.Ct. 773, 779, 3 L.Ed.2d 775 (1959) and provided for federal supremacy over conflicting state laws, has been extended to cover the relationship between the NLRA and other federal statutes. *See Tamburello v. Comm–Tract Corp.*, 67 F.3d 973, 976 n. 2 (1st Cir.1995) (citing *Connell Const. Co. v. Plumbers & Steamfitters Local Union No. 100*, 421 U.S. 616, 626, 95 S.Ct. 1830, 1836–37, 44 L.Ed.2d 418 (1975) and other cases).

underlying conduct complained of in the RICO claim to determine if it falls within the exclusive jurisdiction of the NLRB. *Butcher's Union,* 631 F.Supp. at 1010; *Brennan,* 973 F.2d at 646.

The Unions urge this court to follow *Brennan, supra.* In *Brennan,* a RICO claim was filed by union members who claimed that their employer had engaged in a pattern of extortion and fraud by terminating union members who engaged in union activity, by threatening and coercing employees to accept poor working conditions, and by misrepresenting reasons for refusing to increase wages. The court held that the union's RICO action was preempted by the NLRA because the "pilots' RICO claim is preempted by *Garmon* as it involves conduct protected and prohibited by the NLRA." *Brennan,* 973 F.2d at 647.

*Brennan,* however, is distinguishable from the instant case in that it involved conduct that was unlawful only by reference to the labor laws. *See, e.g., Brennan,* 973 F.2d at 647 (referring to §§ 7 and 8 of the NLRA to determine that pilots' claim that employer violated compensation provisions of the CBA was unlawful.) Here, by contrast, many of the alleged predicate acts involving arson, robbery, destruction of property and assault do not require this court to look to the labor laws to determine whether they are unlawful.

Similarly, the Unions' reliance on *Tamburello, supra,* is unavailing. In *Tamburello,* plaintiff alleged that soon after he became a shop steward, his employer placed him on the less desirable work assignments, reduced his chances for overtime pay, made him take a forced vacation or face termination, took away his company vehicle, and made threatening anti-union activities. All of this was done to coerce him into giving up his union steward position, and eventually, to resign his position. *Tamburello,* 67 F.3d at 978. The First Circuit, in finding that preemption was appropriate in that instance, stated:

> The problem is that none of this alleged conduct is illegal without reference to the NLRA. It is the NLRA that prohibits employers from creating intolerable working conditions to discourage union activities, (citations omitted), and it is the NLRA that prohibits an employer from interfering with an employee's right to join a union and engage in concerted activities for mutual aid and protection. (Citation omitted). Indeed, one would presume that Congress passed the NLRA, at least in part, precisely because conduct such as that complained of by Tamburello was not theretofore prohibited. We thus agree with the district court's conclusion that "the alleged conduct that led to [Tamburello's] termination of employment is illegal only by reference to union activities."

*Id.* at 978–88. Here, this court is not faced with the same situation in that it need not look to the NLRA to determine whether many of the alleged predicate acts are illegal.

Likewise, in *McDonough v. Gencorp, Inc.,* 750 F.Supp. 368 (S.D.Ill.1990), the court, when faced with claims alleging mail and wire fraud based upon unfair labor practices had to "look to other laws." *Id.* at 370. In *McDonough,* the plaintiffs attempted to organize the hourly employees of the defendant corporation. In response, the defendant allegedly formed an enterprise to establish a pattern of anti-union activity. Specifically, the complaint alleged that the defendants used the mails and telephone calls to misrepresent facts concerning the Union, its organizers and the company's ability to maintain a newly implemented bonus plan and to threaten violence and bodily harm if plaintiffs continued their unionizing activities. *Id.* at 369. The court, in dismissing the complaint as preempted, stated:

> ... [I]t is clear that the RICO claim presented in the case at bar is pre-empted by the NLRA because each of the predicate acts alleged in the complaint is based solely upon labor law violations. As the defendants point out, the conduct alleged in the complaint is all part of one scheme to deprive the plaintiffs of democratic participation in the selection of a union. This claim is actionable only by virtue of sections 7 and 8 of the NLRA. The RICO claim is therefore pre-empted by the NLRA.

*Id.* at 371.

In the case at bar, however, many of the alleged predicate acts have no bearing what-

soever on the labor laws. They are unlawful without the need to be so defined by the federal labor laws. In the above cited cases [3], the defendants' conduct would only be illegal "but for" the proscriptions of labor law. *See Butchers' Union,* 631 F.Supp. at 1011. This court need not look to the labor laws to determine that many of the predicate acts alleging arson, robbery, destruction of property and physical assault herein are illegal.

In this regard, this court is in agreement with the decision in *MHC v. International Union, United Mine Workers of America,* 685 F.Supp. 1370 (E.D.Ky.1988). In *MHC,* the court held that no preemption existed where the defendant unions were alleged to have committed violent acts, including murder and arson, in their attempts to become the recognized bargaining agent of the plaintiff's workers. The court concluded that:

> If the activities alleged in a RICO claim involving a labor entity are such that they would obviously be illegal under any and all circumstances and involving any and all perpetrators, the matter is not so tied to labor law as to make preemption necessary ... For example, murder and destruction of property would be illegal whether or not there was a labor motive or relationship. No interpretation of labor law is necessary to make a determination of liability. A series of these sorts of illegal activities could establish a "pattern of racketeering activity" for RICO purposes with respect to the entity or entities responsible.

*MHC,* 685 F.Supp. at 1378 (citations omitted).

■ This court finds that predicate acts alleging robbery, arson, destruction of property and other "obviously illegal" acts such as assault do not require an interpretation of labor law.

Many of the predicate acts allege "garden variety" labor dispute conduct such as: "yelling obscenities" (predicate act # 54), issuing threats such as "we're going to get you" (# 47), "you'll be sorry" (# 1), and telling a newspaper carrier that "[y]ou had better dump those papers" (# 54), making threats such as "[g]et the hell out of my neighborhood or I'm going to get you" (# 37), claiming a striker will "get even" with an employee (# 55), leaving a note for a newspaper carrier that read "[d]eliver and your [sic] dead" (# 12).

However, some of the other alleged predicate acts amount to conduct that is not "garden variety," such as predicate acts # 197 and # 220 which involve assaults and predicate acts # 54 and # 156 which involve destruction of property.

The *MHC* court recognized that:

> A series of these sorts of illegal activities [murder and destruction of property] could establish a "pattern of racketeering activity" for RICO purposes with respect to the entity or entities responsible. In these instances, there would be little possibility that Courts and the NLRB would deliver contradictory decisions having an adverse effect upon labor policy. The "chilling effect" upon the exercise of labor rights would be limited since the activities being discouraged are criminal in nature and not within the scope of activities contemplated by the NLRA. Those who commit such activities are in no doubt as to the illegality of their actions and should know that they can be held responsible. If the requisites of RICO can be established in such cases, those responsible cannot stand behind the NLRA to avoid responsibility.

*MHC* 685 F.Supp. at 1378.

■ This court is mindful of the risk to national labor policy which would result from

---

**3.** Neither does *Buck Creek Coal, Inc. v. United Mine Workers of America,* 917 F.Supp. 601 (S.D.Ind.1995), mandate a different result. In *Buck Creek,* the defendants were accused of roughly three categories of activities. The first being intimidation or harassment of certain persons at or within the vicinity of the Buck Creek company. The second was theft and vandalism which damaged property of others. The third was the failure to control the actions of individu-

al union members who engaged in the first two activities. *Id.* at 611. In finding preemption, in part, the *Buck Creek,* however, stated that: "[t]o the extent that federal labor law does not preempt the conduct, (i.e. the second category of conduct, and any conduct in categories one and three that also violates criminal laws), the Court will proceed with an analysis of the merits of the RICO claim." *Id.*

inconsistent judicial determinations as to whether the alleged conduct is merely collateral to the labor laws, thereby permitting a RICO action, or is an unfair labor practice, thereby requiring NLRB preemption. The court's approach herein, however, will not offend NLRB jurisdiction since it will defer to the NLRB's jurisdiction to remedy alleged extortionate conduct that is arguably protected or prohibited by the NLRA while allowing any conduct which is obviously criminal to constitute a RICO predicate act.

In sum, this court will not "underappreciate[ ] the preemptive force of the National Labor Relations Act. . . ." *Domestic Linen Supply & Laundry Company v. International Brotherhood of Teamsters, et al.*, 1992 WL 566326, *5 (E.D.Mich. Oct. 30, 1992) (J. Cohn), however it will not allow the Unions to hide behind the shield of the NLRA in an attempt to evade the effect of RICO for conduct that is criminal under any measure. *See MHC*, 685 F.Supp. at 1380. Accordingly, this court finds that none of the alleged acts of arson or robbery are preempted and furthermore that the following alleged acts of extortion are not preempted: # 15, # 18, # 27, # 48, # 54, # 62, # 65, # 68, # 101, # 119, # 135, # 168, # 197, # 218, # 220, and # 249.[4]

## B. The First Amendment

The Unions argue that the majority of Count Two, regarding the Unions' alleged conspiracy to engage in racketeering activity, is barred by the First Amendment's guarantee of freedom of speech and association. As a threshold matter, however, the Unions fail to explain how the DNA's RICO complaint invokes the First Amendment in light of the absence of a state actor, to wit: the DNA is a private party suing another private party. Presumably the union's "state action" argument would parallel the Supreme Court's reasoning in *NAACP v. Claiborne Hardware*, 458 U.S. 886, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982); however they do not so argue. In *Claiborne*, the Court found "state action" where the state court applied state rules of law in a manner alleged to restrict First Amendment freedoms. *Id.* at 916 n. 51, 102 S.Ct. at 3427 n. 51. Assuming, *arguendo*, that the this case involves state action, the Unions' First Amendment argument, nevertheless, is without merit.

The DNA claims, as evidence of a conspiracy, such things as the Unions' requirement that strikers engage in picketing in order to receive strike pay, that the Unions required pickets to sign in at the picket site with a picket "captain" to verify their presence each day, that the Unions sent out flyers and bulletins announcing their activities, and that the Unions brought weapons and incendiary devices to mass picket sites.

The Unions' First Amendment argument falls short where it simply points to this "evidence" and then concludes that each of these activities, standing on their own, amount to nothing more than organizing for the strike. This is certainly true, so long as the Unions' tactics fall within the bounds of the law. If, however, the Unions are sending out flyers to encourage extortion, arson, robbery and destruction of property, then the flyers may become evidence of a conspiracy, not merely protected speech. It cannot be said, at this time, that the DNA cannot prove any set of facts which would support its conspiracy claim.

The Unions also assert that many predicate acts alleging extortion must be dismissed if the acts themselves were protected speech.[5] This court, however, need not engage in a protracted First Amendment analysis concerning those acts since the predicate acts alleging extortion which remain are obviously criminal irrespective of the speech that may or may not have occurred. Accord-

---

4. Predicate Acts # 8, # 82, # 111, # 122, # 125, # 133, # 142, # 150, # 151, # 155, # 156, # 158, # 171, # 177, # 178, # 184, # 185, # 193, # 194, # 195, # 199, # 205, and # 206, although alleging destruction of property and assault, do so in a vague and/or conclusory manner and are therefore dismissed without prejudice.

5. The Union cites as examples of this, predicate act # 4 (you fuck, I'm going to kick your ass"), # 80 ( [w]e are going to kick your ass), and # 105 (another kicking ass claim). In total the Unions have isolated 65 predicate acts involving comments such as those above, plus yelling obscenities, making racist and sexist remarks, and name calling directed at persons crossing the picket line.

ingly, this court will not dismiss any alleged predicate acts on First Amendment grounds that were not dismissed under the preemption argument. *See* discussion *supra.*

## C. Racketeering Activity

RICO proscribes "racketeering activity," which is defined as:

> (A) any act or threat involving murder, kidnaping, gambling, arson, robbery, bribery, extortion, or dealing in narcotic of other dangerous drugs, which is chargeable under State law and punishable by imprisonment for more than one year; (B) any act which is indictable under any of the following provisions of title 18, United States Code: ... section 1951 (relating to interference with commerce, robbery, or extortion) [known as the Hobbs Act] ... 18 U.S.C. § 1961(1).

The Unions have three arguments that their conduct does not reach that which is proscribed as "racketeering activity." First, they argue that their conduct is not indictable under the Hobbs Act 18 U.S.C. § 1951 because the Act does not proscribe the use of force to achieve legitimate labor goals. Second, that the DNA fails to allege facts sufficient to establish robbery under the Hobbs Act or Michigan's robbery law. Finally, that the conduct the DNA alleges is not chargeable under Michigan's arson law or Michigan's extortion law.

At the outset, it should be noted that this court discusses the union's arguments, that the alleged predicate acts of extortion do not constitute racketeering activity, as an alternative basis for dismissal having already decided to dismiss those alleged acts as being preempted.

### 1. Extortion

■ A RICO complaint can plead extortion under the Hobbs Act, under state law, or under both. In this case the DNA has pleaded both. Under the Hobbs Act, extortion is defined as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2).

The Supreme Court, in *United States v. Enmons,* 410 U.S. 396, 93 S.Ct. 1007, 35 L.Ed.2d 379 (1973), held that the Hobbs Act does not prohibit violence committed during a lawful strike for the purpose of inducing an employer's agreement to legitimate collective bargaining demands. In the context of a labor dispute, the Court specifically found that if the violence was not for paying off union officials or receiving payment for work not performed (featherbedding), then the Hobbs Act does not apply.

■ The DNA responds to this argument by claiming that they have, in fact, pleaded featherbedding. However, nowhere in their complaint does activity amounting to featherbedding appear. Rather, the DNA confuses its own opinion, that the union's activity is not in furtherance of "legitimate" goals, with a strike that is not legitimate because it seeks unlawful payments to union officials, or featherbedding. Thus, the holding of *Enmons* applies to this case, and an alleged violation of the Hobbs Act cannot form the basis for a RICO predicate act.

■ The Michigan extortion statute, M.C.L. 750.213, prohibits in relevant part, maliciously threatening injury to the person or property of another with the intent to compel the person so threatened to do or refrain from doing an act against his will. The Unions argue that coercive activity proscribed by the Michigan statute does not constitute extortion under RICO, 18 U.S.C. § 1961(A)(1). This argument is misguided, as RICO prohibits extortion as defined by *both* federal and state statute.

■ An argument could be made that the Supreme Court's justification for not allowing charges of extortion under the Hobbs Act to go forward applies with equal force in the state law context. *See United States v. Thordarson,* 646 F.2d 1323, 1327 n. 9 (9th Cir.1981) (stating that "[i]n light of the emphasis in *Enmons* on the special characteristic of the crime of extortion ... its holding delimiting the scope of the Hobbs Act arguably should be extended to similarly limit the scope of the RICO ... extortion provisions"). Such an argument, however, was rejected by the *MHC* court and is likewise rejected by this court. The *MHC* court, in discussing *Enmons* and *Thordarson,* stated:

The [*Thordarson*] Court read *Enmons* "as holding only that the use of violence to secure legitimate collective bargaining objectives is beyond the reach of the Hobbs Act." *Id.* At 1327. The Court found no basis for the creation of an "*Enmons* doctrine" placing all violence occurring during the course of legitimate labor activity beyond the reach of all federal criminal statutes. *Id.*

This Court is in agreement with the *Thordarson*/[*U.S. v.*] *Chambers* [515 F.Supp. 1 (N.D.Ohio 1981)] interpretation of *Enmons*. To interpret otherwise would effectively immunize from federal criminal prosecution unions and employers who consistently resort to violence and other illegal activities to achieve their objectives. *MHC,* 685 F.Supp. at 1379–89. Accordingly, this court finds that conduct alleged to violate the Michigan extortion statute can form the basis of a RICO predicate act.

### 2. Robbery

Under the Hobbs Act, robbery is defined as:

The unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury ... to his person or property ... 18 U.S.C. 1951(b)(1).

■ The Unions argue that sixteen of the nineteen alleged predicate acts of robbery do not amount to robbery under the above definition, as they do not involve unlawful taking from a person. Rather, they involve activity that would amount to larceny under state law, such as removing papers from unattended newspaper racks, from subscribers' lawns, from vendors' racks, and from drop spots. The DNA responds by pointing to predicate act # 17, which clearly involves obtaining property (newspapers), from a DNA employee, against his will, by means of threatened force (the use of a baseball bat and an ax handle). Act # 17 clearly alleges each of the elements of robbery, and therefore should not be dismissed. However, only two other predicate acts, Act # 13 and Act # 200, arguably satisfy the definition of robbery under the Hobbs Act. The other

predicate acts do not assert that the unlawful taking was in the presence of a person and/or that it was accomplished through actual or threatened force, and for that reason they do not amount to robbery under the Hobbs Act.

■ Similarly, M.C.L. 750.530 provides, in relevant part, that:

Any person who shall, by force and violence, or by assault or putting in fear, feloniously rob, steal and take from the person of another, or in his presence, any money or other property which may be the subject of larceny, such robber not being armed with a dangerous weapon, shall be guilty of a felony....

Under M.C.L. 750.530, as under the Hobbs Act, only predicate acts # 13, # 17 and # 200 have properly pleaded robbery. As this is a motion to dismiss, the court must "accept all well-pleaded allegations of the complaint as true and construe them in a light most favorable to the [non-moving party]," *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). Using this standard, however, all alleged predicate acts of robbery, with the exception of Acts # 13, # 17, and # 200, must, nevertheless, be dismissed.

### 3. Arson

The DNA has pleaded that the Unions violated Michigan's arson laws, M.C.L. 750.73, 750.74 and 750.77. These statutes require one to prove that another set fire to property or performed an act that results in the starting of a property fire, or that another used, arranged, or placed any inflammable or explosive device or substance, with intent to wilfully and maliciously set fire to burn.

■ The Unions argue that the DNA has failed to plead arson in the majority of the predicate acts because they do not indicate that there was any actual burning and subsequent damage to the property. M.C.L. 750.77 provides, in relevant part, that:

Any person who shall in any manner use, arrange, place, devise or distribute any inflammable, combustible or explosive material, liquid or substance, or any device in or about any building or property ..., with the intent to wilfully and maliciously set

fire to or burn the same, ... shall be guilty of a felony.

Since there is no requirement that an actual burning take place, the Unions' argument must fail as to most of the alleged predicate acts of arson. Only arson predicate Acts # 74, # 227, # 237, alleging the use of a "smoke grenade;" Act # 73, which fails to allege any building or property in or about the explosive material; and Act # 186 which alleges an object resembling a bomb, will be dismissed.

### D. Standing to Plead Racketeering

Next, the Unions argue that certain alleged predicate acts injured only third parties, not the DNA, and that as a result the DNA lacks standing to pursue those claims. In *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268, 112 S.Ct. 1311, 1317–18, 117 L.Ed.2d 532 (1992), the Court articulated three reasons why an individual who is harmed by racketeering activity aimed at third parties stands too remote to collect damages. 1) The less direct the injury, the more difficult it is to ascertain the amount of damages attributable to the violation; 2) allowing recovery for indirect injuries would require a court to adopt complicated rules for apportioning damages among plaintiffs; and 3) the directly injured can be counted on to vindicate the law. *Id.*, at 268–69, 112 S.Ct. at 1317–18.

The Court's reasoning in *Holmes* was adopted by the Sixth Circuit in *Firestone v. Galbreath*, 976 F.2d 279, 285 (6th Cir.1992). In that case, the grandchildren of a decedent filed a RICO claim against the trustees of the decedent's estate for crimes that they claim decreased their share of the estate. The court found that the grandchildren had only pleaded an indirect injury, since any harm suffered by them flowed "merely from the misfortunes allegedly visited upon the [decedent] by the defendants." *Id.*, at 285.

Here, the situation is, however, quite different. To the extent that the alleged predicate acts are proven to have occurred, they were aimed directly at the DNA. Apart from the strike, there would be no reason for the Unions to attempt to halt the delivery of newspapers, hassle employees on the way to work, or stop the printing of newspaper copy, all of which undoubtedly had an injurious effect on the DNA.

Although the Unions are technically correct in asserting that many of the alleged predicate acts only indirectly injured the DNA, those injuries, if proven, are within the scope of those contemplated by Congress when it enacted the RICO legislation. According to *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985), "RICO is to be read broadly," to permit recovery for both direct and indirect damages which flow from the commission of predicate acts.

Accordingly, the DNA has standing to bring its RICO claim, and this court will not base its dismissal of any of the predicate acts on the Unions' claim that the DNA lacks standing.

### E. Pattern of Racketeering

The Unions argue that once the court has removed each of the predicate acts under their preemption, first amendment, and other arguments outlined above, only ten [6] alleged predicate acts remain. The Unions assert that these acts, standing alone, are isolated and unique, and as such, fail as a matter of law to establish a pattern of racketeering activity. This court, however, has found that some forty-four [7] predicate acts remain.

In order to establish a pattern of racketeering activity, a RICO plaintiff must prove 1) a closed period of repeated racketeering activity extending over a significant period of time; or 2) racketeering activity, which by its nature, projects into the future

---

**6.** The ten acts include Acts # 66, # 126, # 143, # 144, # 145, # 152, # 159, # 187, # 190 and # 248. Presumably, the Unions would likewise not object to predicate Act # 253, alleging arson and involving an actual burning, thereby bringing the total to eleven acts.

**7.** The forty-four acts include: Acts # 13, # 15, # 17, # 18, # 27, # 48, # 54, # 62, # 65, # 66, # 68, # 101, # 108, # 119, # 120, # 126, # 129, # 131, # 134, # 135, # 143, # 144, # 145, # 148, # 152, # 153, # 159, # 168, # 179, # 181, # 183, # 187, # 190, # 197, # 198, # 200, # 212, # 218, # 220, # 233, # 239, # 248, # 249, and # 253.

with a threat of repetition. *See H.J. Inc. v. Northwestern Bell Telephone, Inc.*, 492 U.S. 229, 241, 109 S.Ct. 2893, 2901–02, 106 L.Ed.2d 195 (1989) (holding that a pattern requires at least two "predicate acts" of racketeering activity within ten years of each other).

According to *Vemco, Inc. v. Camardella*, 23 F.3d 129 (6th Cir.1994), a pattern of racketeering activity is not automatically proven by a large number of unrelated acts. Rather, the predicate acts must be ordered and arranged so as to exhibit "relatedness and continuity." *Id.* at 133. In *Vemco*, a manufacturer brought a RICO claim against a contractor engaged in a scheme to misrepresent its ability to build a facility for the plaintiff at a specified price. The district court dismissed the claim, in part for failure to plead a pattern of racketeering activity, as this was a one-time scheme with a single objective from a single victim.

The Unions' contention, however, that a pattern of racketeering has not been pleaded is misplaced. First, this court finds that the DNA has properly alleged some forty-four predicate acts rather than the eleven [8] that the Unions urge. More importantly, however, the Supreme Court has set forth a general requirement that there be *continuity* and *relatedness* among the predicate acts. *See Sedima*, at 479, 105 S.Ct. at 3276–77. Here, the alleged predicate acts are clearly related to affecting the outcome of the labor dispute. In fact, the Unions do not contest the relatedness prong of the pattern of racketeering requirement.

The remaining issue is the continuity prong. When a lawsuit is brought before the plaintiff can show activity over a long period of time, as in the case at bar, the crucial showing is "whether the *threat* of continuity is demonstrated." *Vemco*, at 134 (quoting *H.J., Inc.*, 492 U.S. at 241–42, 109 S.Ct. at 2901–02. The Sixth Circuit, in *United States v. Busacca*, 936 F.2d 232 (6th Cir.1991) stated that:

> the threat of continuity need not be established solely by reference to the predicate acts alone; facts external to the predicate

acts may, and indeed should, be considered. In sum, the totality of the circumstances surrounding the commission of the predicate acts are considered to determine whether those acts pose a threat of continuing activity.

*Id.* at 238 (citations omitted).

The Unions assert that not only has the activity complained of ceased, but all strike related activity will cease the moment the strike ends. Thus, the Unions contend, there is no possible threat of continuity beyond that point. That argument, however, is clearly flawed. The *Busacca* court stated that "[a]n analysis of the threat of continuity cannot be made solely from hindsight. All racketeering activity must necessarily come to an end sometime.... Rather, in the context of an open-ended period of racketeering activity, the threat of continuity must be viewed at the time the racketeering activity occurred." *Id.*

If this court accepted the Unions' premise, that any criminal conduct complained of has already ceased or will cease upon termination of the strike, and that therefore there is no continuity, no successful racketeering activity could ever pose a danger of continued activity. Under the unions' reasoning, once they were successful in accomplishing their goals, and the alleged criminal activity ceased, no claim could survive the "continuity" element. This can not be the case.

Instead, this court finds, as the *Busacca* court recognized, that there is an implicit threat of continuity in the ongoing strike. The *Busacca* court, citing *Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Local Union 639*, 883 F.2d 132, 144–45 (D.C.Cir.1989) *overruled en banc on other grounds*, 913 F.2d 948 (1990), stated that "four threats of violence against a bus company by union members during a four day strike period were deemed sufficient to allege a pattern of racketeering activity since the threats could be found to be the means of conducting the strike which in turn could have continued for an indefinite period of time." *Busacca*, 936 F.2d at 238.

---

8. *See* footnote 6 *supra*.

As such, any dismissal on the basis of failure to establish a pattern of racketeering would be premature at this point. Accordingly, the DNA has sufficiently satisfied the pleading requirement of alleging a pattern of racketeering activity.

**F.  Union Liability for Acts Committed by Members**

The Unions argue that to the extent the DNA has alleged violations of various statutes that form the basis of a RICO complaint, they have failed to make a showing that the Unions themselves sponsored, approved, or caused any of this activity. They cite a series of cases that stand for the premise that courts have developed strict standards for imposing union liability for members' conduct.

The DNA disputes the Unions' interpretation of the cases, and argues that it must merely show that the Unions tolerated the disputed activity. Further, the DNA argues that, with further discovery they will be able to convince the trier of fact that the Unions were responsible for the alleged predicate acts.

On a motion to dismiss the court may only dismiss the complaint if no relief could be granted under any set of facts that could be proved consistent with the allegations. Accordingly, this court will deny the Unions' argument regarding liability. *Saylor v. Parker Seal Co.*, 975 F.2d 252, 254 (6th Cir.1992). While the DNA may have an evidentiary problem in this context, it is not inconceivable that the DNA could prove a set of facts that would establish that the Unions are liable for some significant number of the alleged predicate acts.

### *Local 289*

Local 289, GCIU filed a supplemental brief seeking dismissal of the counterclaim as to it alone. Local 289 argues that the DNA failed to indicate how it, or any of its agents, were implicated in any of the predicate acts. While the vast majority of predicate acts alleged involve a specific Teamster member,

the DNA argues that all of the Unions are responsible for all of the acts of the others because of a conspiracy among them, which the DNA claims it can prove with additional discovery. Again, this court may only dismiss the complaint if no relief could be granted under any set of facts that could be proved consistent with the allegation. Accordingly, this court will not dismiss the DNA's RICO counterclaim against Local 289. This court will, however, direct the parties to structure discovery so that the conspiracy charge is dealt with first, thereby allowing those counter-defendants, such as Local 289, GCIU, which believe they can show that there is no question of material fact as to their participation in a conspiracy, to move for summary judgment.

## *V.  CONCLUSION*

In sum, this court will grant the Unions' motion to dismiss to the following extent:

All of the alleged predicate acts of extortion except for predicate acts # 15, # 18, # 27, # 48, # 54, # 62, # 65, # 68, # 101, # 119, # 135, # 168, # 197, # 218, # 220, and # 249 are dismissed with prejudice [9] as being preempted by the NLRA.

All of the alleged predicate acts of robbery except for predicate acts # 13, # 17 and # 200, are dismissed with prejudice as they fail to constitute racketeering activity.

All of the alleged predicate acts of arson except for predicate acts # 66, # 108, # 120, # 126, # 129, # 131, # 134, # 143, # 144, # 145, # 148, # 152, # 153, # 159, # 179, # 181, # 183, # 187, # 190, # 198, # 212, # 233, # 239, # 248, and # 253 are dismissed with prejudice for failing to constitute racketeering activity.

The remainder of the Unions' motion to dismiss is denied.

## *ORDER*

**IT IS HEREBY ORDERED** that plaintiffs/counter-defendants', Detroit Mailers Un-

---

9.  Predicate Acts # 8, # 82, # 111, # 122, # 125, # 133, # 142, # 150, # 151, # 155, # 156, # 158, # 171, # 177, # 178, # 184, # 185, # 193, # 194, # 195, # 199, # 205, and # 206, although alleg-

ing destruction of property and assault, do so in a vague and/or conclusory manner and are therefore dismissed without prejudice.

ion Local 2040, Teamsters Local 372, Newspaper Guild Local 22, GCIU Local 289, GCIU 13N, and Detroit Typographical Union Local 18, motion to dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(6), the amended counterclaim of the defendant/counter-plaintiff, Detroit Newspaper Agency is **GRANTED,** in part, and **DENIED,** in part, as set forth above.

**SO ORDERED.**