**OVERNITE TRANSPORTATION COMPANY, Plaintiff,**

v.

**INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN & HELPERS OF AMERICA, AFL–CIO, et al. Combs, Inc., Defendants.**

No. 2:00CV3109, 1:00CV1023.

United States District Court,
W.D. Tennessee,
Western Division.

Feb. 27, 2001.

Stephen L. Shields, Robin H. Rasmussen, Jackson Shields Yeiser & Cantrell, Cordova, TN, Kenneth T. Lopatka, Craig R. Thortenson, Jeffrey L. Madoff, Matkov Salzman Madoff & Gunn, Chicago, IL, for plaintiff.

Jodi Trulove, Steven J. Roman, Woody N. Peterson, Erica J. Dominitz, Dickstein Shapiro Morin & Oshinsky, Washington, DC., Samuel Morris, Allen Godwin Morris Laurenzi & Bloomfield, P.C., Memphis, TN, for defendants.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS; AND ORDER GRANTING DEFENDANTS' MOTION TO STRIKE MATERIAL FROM PLAINTIFF'S SECOND AMENDED COMPLAINT

DONALD, District Judge.

Defendants; the International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of American, AFL–CIO ("IBT"); James P. Hoffa; C. Thomas Keegel; Randy Cammack; Fred Gegare; Chester Glanton; Thomas R. O'Donnell; Ralph J. Taurone; Patrick W. Flynn; Walter Lytle; Dotty Malinsky; Lester A. Singer; Philip E. Young; Jack Cipriani; John Murphy; Dan DeSanti; Richard Volpe; Ken Wood; Charlie Gardner; Chuck Mack; Jon L. Rabine; W. James Santangelo; Jose E. Cadiz; Ron McClain; John Steger; David Cameron; Robert Kruezer; John R. Cuite; Robert Kirkpatrick; and Robert Ramshaw moved to dismiss, transfer, and strike Plaintiff's, Overnite Transportation Company's ("Overnite"), second amended complaint alleging violations of 18 U.S.C. §§ 1961–1968 (1994), Racketeer Influenced and Corrupt Organization ("RICO"); tortious interference with Plaintiff's business; tortious interference with Plaintiff's employment relations; and malicious destruction of property. Judge Todd in the Western District of Tennessee, Eastern Division, denied Defendants' motion to transfer the case to the District of Columbia, but transferred the case to this Court in the Western Division.

For the following reasons, the Court grants Defendants' motion to dismiss all of the predicate acts asserting violations of 18 U.S.C. § 1951 (1994), the Hobbs Act; 18 U.S.C. § 1952 (1994), the Travel Act; state criminal extortion statutes; and state criminal assault statutes, without prejudice. Further, the Court grants Defendants' motion to dismiss Plaintiff's claims of tortious interference with business relations, tortious interference with employment relations, and malicious destruction of property. The Court denies Defendants' motion to dismiss those predicate acts sufficiently pleading attempted murder. The Court grants Defendants' motion to strike paragraphs 33–37 and 78–81 from the second amended complaint.

## I. Background Facts

Overnite is a Virginia corporation duly registered and qualified to do business in

Tennessee. Overnite is a common carrier engaged in the interstate transportation of freight by motor vehicle. Presently, Overnite has two service centers in the Western District of Tennessee, one in Jackson and one in Memphis. Overnite employs roughly 13,000 individuals.

Defendant, the IBT, is a voluntary, unincorporated association commonly known as a labor union. The IBT maintains a principal office in Washington, D.C. and transacts its affairs throughout the United States, including the Western District of Tennessee.

Defendant, Hoffa, is the general president of the IBT and maintains an office in Washington, D.C. Defendant, Keegel, is the general secretary-treasurer of the IBT and maintains an office in Washington, D.C. Defendants, Cammack, Gegare, Glanton, O'Donnell, and Taurone, are vice presidents at-large of the IBT with offices in Covina, California; Green Bay, Wisconsin; Chicago, Illinois; Lake Success, New York; and Layton, Utah, respectively. Defendants, Flynn, Lytle, Malinsky, Singer, and Young are central region vice presidents with offices in Chicago, Illinois; Fort Wayne, Indiana; Bloomington, Minnesota; Toledo Ohio; and Kansas City, Missouri, respectively. Defendants, Cipriani, Murphy, DeSanti, and Volpe are eastern region vice presidents with offices in Greensboro, North Carolina; Boston, Massachusetts; North Brunswick, New Jersey; and New Hyde Park, New York, respectively. Defendants, Wood and Gardner, are southern region vice presidents with offices in Tampa, Florida and Dallas, Texas, respectively. Defendants, Mack, Rabine, and Santangelo, are western region vice presidents with offices in Oakland, California; Seattle, Washington; and El Monte, California, respectively. Defendants, Cadiz, McClain, and Steger are trustees for the IBT with offices in San Jaun, Puerto Rico; Des Moines, Iowa; and Washington, D.C., respectively. Defendant, Cameron, is a director of communications with the IBT with an office in Arlington, Virginia. Defendants, Kruezer and Ramshaw are international organizers for the IBT with offices in O'Fallon, Missouri and Sunrise Beach, Missouri, respectively. Defendant, Cuite, is an international representative with the IBT with an office in Dix Hills, New York. Defendant, Kirkpatrick, is an international organizer for the IBT, but the second amended complaint does not specify the location of his office.

The IBT has allegedly attempted to organize Overnite's employees for fifty-four years. Overnite alleges the IBT has used intentional and criminal acts in an effort to accomplish this goal. In their second amended complaint, Plaintiff recounts alleged illicit acts on the part of the IBT against Overnite, specifically citing activity in 1945, 1957, 1977, and 1984.

As of 1994, Overnite was the largest non-union less-than-truckload ("LTL") carrier in the country.[1] From that point to the present, the IBT has allegedly continued attempts to organize Overnite's employees. Overnite asserts that it has bargained continuously with the IBT, conducting 150 meetings over a period of four years. Nonetheless, of the 166 service centers throughout Overnite's system, only 22 locations have been formally and finally certified for collective bargaining with the IBT. (Second Amended Complaint para. 38.) This equals roughly fourteen percent of Overnite's total workforce of 13,000. At four service centers,

---

1. LTL carriers consolidate shipments from many customers each of whose freight going to one location at any point is not of sufficient volume to fill a trailer. Freight is separated at a destination terminal and then delivered on pick-up and delivery vehicles to the recipient's premises.

Overnite has elected to test the National Labor Relations Board's ("NLRB") certification of the IBT as Overnite's employee's bargaining representative. At four different service centers, the NLRB has ordered Overnite to bargain with the IBT on behalf of the Overnite employees working at that site, even though the employees allegedly rejected IBT representation in a secret-ballot election.

On September 21, 1995, the IBT allegedly called a meeting in Washington, D.C. to map out a new comprehensive strategy to "deal" with Overnite. At this meeting the IBT allegedly established a new nationally-coordinated bargaining committee to serve as a master team for concerted action against Overnite and to bargain for a national contract with Overnite. The IBT allegedly pledged to commit its legal, communications, research, and organizing departments to the effort. The second amended complaint asserts that the IBT also planned to set dates to call Overnite customers and characterized itself as the clearing house for all bargaining issues and positions with Overnite. Plaintiff alleges that all IBT local unions ("Locals") have deferred to the IBT's leadership in setting policy and tactics in all areas with Overnite.

On April 12, 1999, the IBT allegedly informed Overnite that the newly-elected IBT president, Hoffa, had unilaterally named a new committee for negotiating a contract with Overnite. The second amended complaint asserts that Hoffa proclaimed the Overnite situation of utmost importance to him. On May 1, 1999, Hoffa appointed Young as the director of freight operations for the IBT, its chief representative in dealing with all freight carriers, including Overnite.

In early May, 1999, Hoffa and Young allegedly held a meeting in Chicago with numerous Locals' representatives to discuss how to force Teamsters representation and a Teamsters contract on Overnite and its employees. According to the second amended complaint, the IBT and the Locals agreed to use as many as 100,000 employees working for other Teamsters-represented carriers to coerce Overnite and its employees into accepting Teamsters representation.

On May 13, 1999, Defendant, Young, allegedly sent a memorandum to all Locals, instructing them to contact and warn Overnite's customers that the IBT would calls strikes against Overnite if Overnite did not settle the contract and other disputes on favorable terms. The IBT allegedly began sending letters and e-mails to Overnite's customers, telling them that Overnite had labor troubles and threatening "labor unrest" which would delay Overnite's delivery service. According to the second amended complaint, IBT spokespersons began declaring publicly and privately that Overnite would either be a Teamsters company by the end of the year, or the IBT would force Overnite to close its doors.

Plaintiff alleges that at some point prior to June 14, 1999, the IBT and its Locals adopted and implemented a plan to commit various tortious and criminal acts against Overnite and its employees in order to coerce Overnight and its employees to accept a Teamsters contract on the IBT's terms.

Plaintiff alleges that Defendants have conducted and/or participated in the affairs of a RICO Enterprise ("RICO Enterprise"), consisting of an association-in-fact. This association-in-fact is allegedly composed of individuals, who are otherwise employed by or retired from unionized competitors of Overnite, and activists and allied groups aiding and abetting them, who have been recruited by IBT officials and agents. This RICO Enterprise has allegedly engaged in both lawful and un-

lawful conduct in an attempt to force Overnite and its employees to accept IBT representation.

In paragraphs 90 through 276L of its second amended complaint, Plaintiff asserts that Defendants, through the RICO Enterprise committed 221 separate criminal acts against Overnite and its employees in 1999 and 2000. Plaintiff maintains that each of these criminal acts constitutes a predicate offense under RICO. In no specific order, these acts include: shooting at Overnite drivers and their trucks in transit and causing personal injury and property damage (predicate acts # 1, # 2, # 3, # 4, # 7, # 10, # 11, # 12, # 13, # 14, # 15, # 17, # 20, # 22, # 24, # 26, # 27, # 44, # 45, # 52, # 53, # 54, # 55, # 55A, # 55C, # 55D, # 55E, # 55I, # 55M, # 55T, # 55U, # 55W); dropping bricks, cinder blocks, and other objects on Overnite trucks passing under highway overpasses (# 5, # 8, # 21, # 31A, # 32, # 36, # 55L); shooting into an Overnite employee's home (# 31); throwing or launching bricks, rocks, boulders, ball bearings, beer cans, paint, fishing sinkers, padlocks, marbles, pieces of wood and metal, excrement, railroad spikes, and other projectiles at Overnite trucks and vehicles both on the highway and off the highway (# 16, # 18, # 19, # 28, # 29, # 35, # 39, # 41, # 43, # 55F, # 55G, # 55J, # 55O, # 55P, # 62, # 86, # 91, # 92, # 93, # 94, # 100, # 101, # 102, # 103, # 104, # 107, # 109, # 110, # 111, # 112, # 113, # 116, # 119, # 120, # 121, # 124, # 127, # 128, # 132, # 133, # 134, # 135, # 136, # 138, # 145, # 159, # 160, # 162); throwing or launching rocks, Molotov cocktails, bottle rockets, ball bearings, hot coffee, and other objects at Overnite employees (# 9, # 85, # 90, # 95, # 96, # 97, # 98, # 99, # 105, # 106, # 118, # 123, # 144, # 174); assaulting or otherwise intimidating Overnite employees (# 23, # 42, # 48, # 51, # 55K, # 55R, # 64, # 65, # 66, # 67, # 69, # 77, # 125, # 139, # 143, # 147, # 148, # 164, # 166,

# 168, # 185J); harassing Overnite drivers on the road by swerving, braking, and making sudden lane changes in front of those drivers (# 25, # 33, # 34, # 37, # 38, # 39, # 40, # 42, # 47, # 49, # 50, # 55B, # 55S, # 58, # 61, # 63, # 75, # 76, # 115, # 165, # 173, # 179, # 180, # 181, # 182, # 183, # 184, # 185, # 185B, # 185H, # 185L); and destroying and vandalizing company and personal property such as slashing tires, removing lug nuts, cutting air lines, removing "glad hands," puncturing radiators, pulling the pins connecting tractor and trailer, hitting trucks and other vehicles with pickets, baseball bats, crowbars, and fists, and placing a 2x4 with upright nails under a truck's tires (# 30, # 46, # 55N, # 55Q, # 55V, # 57, # 59, # 60, # 68, # 70, # 72, # 73, # 81, # 117, # 122, # 126, # 128, # 129, # 130, # 133, # 137, # 141, # 146, # 148, # 150, # 151, # 153, # 154, # 161, # 162, # 163, # 167, # 169, # 171, # 172, # 177, # 178, # 185K). Plaintiff also asserts that Defendants, through the RICO Enterprise, issued verbal threats to Overnite employees such as "You just don't know what may fly through your window or come off your car one day when you're driving to work;" "If you don't turn that truck around and take your scab ass to the terminal we will jerk you out and kick your fucking ass;" "We're coming after you;" "We're going to make a project of you;" "Wouldn't it be a shame if these Overnite scabs ended up in the weeds;" "I will get him when he goes to work;" "You red-headed cocksucker, we are going to get you;" "I'm fixing to put a lead pipe over your head;" "I'm going to fuck you up when you get back to the terminal;" "Make this your last delivery or it's the last delivery you'll ever make;" "We're going to find out where you live and we'll beat you unconscious;" "I'll beat [sic] bad you're going to beg for mercy;" "We'll find out where you [sic] family is;" "Get ready to meet the Teamsters, you tell

all your boys were going to start beating you. You wanted it, you're going to get it;" "We will shoot you, you little piece of shit;" "Hey, fuck you mother fucker, I'll kick your ass, do you want a piece of me?" "I'm going to fucking kill you, you're dead, you're dead;" "Pull over. Pull over, we're going to kick your ass;" "You're going home in a bag you scab whore;" and displaying firearms (# 31, # 40, # 47, # 55H, # 55Q, # 57, # 67, # 71, # 74, # 79, # 80, # 88, # 95, # 126, # 131, # 133, # 145, # 146, # 150, # 152, # 156, # 157, # 169, # 170, # 185A, # 185C, # 185G, # 185I). Further, Plaintiff asserts that Defendants, through the RICO Enterprise, blocked ingress and egress at Overnite facilities (# 48, # 49, # 142, # 143, # 152, # 160, # 167, # 168, # 176); spat on Overnite employees (# 82, # 83, # 143); shined lasers or spotlights in the eyes of Overnite employees in an attempt to impair their vision (# 84, # 155, # 175, # 185D); issued bomb threats (# 114, # 185E, # 185F); and engaged in trespass. These actions allegedly occurred at Overnite facilities, customer pick-up and delivery locations, and on highways and roads across the country.[2]

On May 11, 2000, Defendants filed a motion seeking to dismiss Plaintiff's cause of action, transfer the case to the District of Columbia, and strike material from the complaint. On November 15, 2000, the Western District of Tennessee, Eastern Division, denied Defendants' motion to transfer the case to the District of Columbia. Judge Todd held that RICO's nationwide service of process provision provides the Western District of Tennessee with personal jurisdiction over the case. (Nov. 15, 2000 Order at 2.) Nevertheless, finding

that a number of the substantial events or omissions giving rise to the cause of action occurred in Memphis, Judge Todd found venue proper in the Western Division and transferred the case to this Court.

## II. Legal Standards

### A. RICO

■ RICO prohibits any person employed by or associated with any enterprise engaged in interstate commerce from conducting or participating in the conduct of such enterprise's affairs through a pattern of racketeering activity. 18 U.S.C. § 1962(c) (1994). A person injured in his business or property by reason of a violation of § 1962 has the right to sue in an appropriate district court and recover treble damages and court costs. 18 U.S.C. § 1964(c); *Rotella v. Wood,* 528 U.S. 549, 552, 120 S.Ct. 1075, 1079, 145 L.Ed.2d 1047 (2000). RICO's statute of limitations is four years, *Agency Holding Corp. v. Malley–Duff & Assoc., Inc.,* 483 U.S. 143, 156, 107 S.Ct. 2759, 2767, 97 L.Ed.2d 121 (1987), and the limitations period generally begins to run when the plaintiff knew or should have known of his injury.[3] *Rotella,* 528 U.S. at 554–55, 120 S.Ct. at 1080–81.

■ To prove a RICO violation, the plaintiff must show (1) that there were two or more predicate offenses; (2) that these predicate offenses formed a pattern of racketeering activity; (3) that an "enterprise" existed; (4) that there was a nexus between the pattern of racketeering activity and the enterprise; and (5) that an injury to business or property occurred as a result of the three aforementioned factors. *See VanDenBroeck v. Common-*

---

2. Plaintiff alleges offenses occurring in Arkansas, California, Georgia, Iowa, Pennsylvania, Texas, Illinois, Indiana, Kansas, Kentucky, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, New Hampshire, New York, Ohio, Tennessee, Virginia, and Wisconsin.

3. The Supreme Court has not settled on a final rule concerning when the statute of limitations begins to run. *Rotella,* 528 U.S. at 554 n. 2, 120 S.Ct. at 1080 n. 2.

*Point Mortgage Co.,* 210 F.3d 696, 699 (6th Cir.2000) (citing *Frank v. 'D'Ambrosi,* 4 F.3d 1378, 1385 (6th Cir.1993)). In addition, a defendant must have not only participated in the scheme, but must have also participated in the operation or management of the enterprise itself. *Id.* (citing *Reves v. Ernst & Young,* 507 U.S. 170, 183, 113 S.Ct. 1163, 1172, 122 L.Ed.2d 525 (1993); *Stone v. Kirk,* 8 F.3d 1079, 1091 (6th Cir.1993))

Only those acts included within the category of "racketeering activity" under § 1961(1) can serve as predicate offenses under RICO. Section 1961(1) defines "racketeering activity" as a broad assortment of state and federal crimes, including any act or threat involving specified state-law crimes, any act indictable under specified federal statutes, and certain federal offenses. 18 U.S.C. § 1961(1); *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 232, 109 S.Ct. 2893, 2897, 106 L.Ed.2d 195 (1989).

█ Once the plaintiff establishes two predicate acts, the plaintiff must demonstrate that these predicate offenses form a pattern of racketeering activity. To establish such a pattern, the plaintiff must establish a " 'relationship' between the predicates' " and the " 'threat of continuing activity.' " *United States v. Blandford,* 33 F.3d 685, 703 (6th Cir.1994) (quoting *H.J. Inc.,* 492 U.S. at 239, 109 S.Ct. at 2901). Criminal conduct satisfies the "relationship" prong if the acts have the same or similar purposes, results, participants, victims, methods of commission, or some other notable characteristics that distinguish them from isolated events. *H.J. Inc.,* 492 U.S. at 240, 109 S.Ct. 2893; S.Ct. at 2901. The Supreme Court did not similarly provide a concise statement to guide the courts when considering the continuity requirement.

Continuity is "both a closed-and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." (citation omitted). The plaintiff may prove continuity by showing a series of past related predicates occurring over an extended period of time. A few months period usually is not sufficient. A second means of establishing continuity is to show that the predicates, by their nature, "involve a distinct threat of long-term racketeering activity." (citation omitted) ... A third way to prove continuity in this case is to allege "predicates [that] are a regular way of conducting defendant's ongoing legitimate business ... or of conducting or participating in an ongoing and legitimate 'RICO enterprise.' " (citation omitted).

*Vild v. Visconsi,* 956 F.2d 560, 569 (6th Cir.1992) (quoting *H.J. Inc.,* 492 U.S. at 241–43, 109 S.Ct. at 2902).

█ "Enterprise" under the statute, means a " 'group of persons associated together for a common purpose of engaging in a course of conduct.' " *VanDenBroeck,* 210 F.3d at 699 (quoting *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981)). To prove an enterprise, the plaintiff must offer evidence of an ongoing organization with various associates functioning as a continuing unit. *Turkette,* 452 U.S. at 583, 101 S.Ct. at 2528. Although the organization can be formal or informal, *id.,* most cases require evidence of some sort of "chain of command" or a hierarchy. *VanDenBroeck,* 210 F.3d at 700.

█ Additionally, RICO pleadings are to be liberally construed. *Turkette,* 452 U.S. at 587, 101 S.Ct. at 2531; *Begala v. PNC Bank, Ohio, Nat'l Ass'n,* 214 F.3d 776, 781 (6th Cir.2000).

## B. Preemption

The intersection of 29 U.S.C. §§ 151–169, National Labor Relations Act ("NLRA"), and RICO creates the complex issue of preemption for federal district courts. The NLRA carves out an area of exclusive jurisdiction over federal labor law and grants the authority to hear cases involving labor disputes to the NLRB. Congress created this exclusive jurisdiction to establish a forum with specific expertise over labor law and to promote uniformity of decision. *Sears, Roebuck & Co. v. San Diego County Dist. Council of Carpenters*, 436 U.S. 180, 191, 98 S.Ct. 1745, 1754, 56 L.Ed.2d 209 (1978); *Garner v. Teamsters, Chauffeurs and Helpers Local Union No. 776*, 346 U.S. 485, 490, 74 S.Ct. 161, 165–66, 98 L.Ed. 228 (1953). The issue of preemption arises when plaintiffs attempt to cast conduct, arguably constituting an unfair labor practice and within the exclusive jurisdiction of the NLRA, as a predicate act for RICO purposes.

The Supreme Court addressed the issue of NLRA preemption in *San Diego Building Trades Council, Millmen's Union, Local 2020 v. Garmon*, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959). In *Garmon*, the Supreme Court held that when an activity is subject to § 7 or § 8 of the NLRA, the federal courts must defer to the exclusive competence of the NLRB. *Garmon*, 359 U.S. at 245, 79 S.Ct. at 780. Section 7 and section 8 of the NLRA regulate strikes and picket lines and govern claims between employers and labor unions. Currently, there is a disagreement in the courts concerning the extent to which Congress intended RICO to reach conduct arguably amounting to an unfair labor practice.

A number of courts examine the nature of the plaintiff's injury and the defendant's conduct to determine whether NLRA preemption applies. *See, e.g., Teamsters Local 372, Detroit Mailers Union Local 2040*

*v. Detroit Newspapers*, 956 F.Supp. 753, 758 (E.D.Mich.1997). If the predicate offense is illegal without reference to the NLRA, the offense can be used in RICO. *Id.* at 760–61. Acts, such as arson, robbery, destruction of property, and physical assault are illegal without reference to federal labor laws and therefore will fall outside NLRA preemption. *Id.* at 761. Nevertheless, yelling obscenities, issuing verbal threats, and making written threats constitute the "garden variety" conduct accompanying labor disputes and falls within the exclusive jurisdiction of the NLRA. *Id.* In *MHC, Inc. v. Int'l Union, United Mine Workers of America*, 685 F.Supp. 1370 (E.D.Ky.1988), the Eastern District of Kentucky stated, "So long as the predicate acts exist independent of any unfair labor practice resolutions, the NLRB's exclusive jurisdiction is not violated since the Court will not be forced to interpret labor law except as a collateral matter." *MHC*, 685 F.Supp. at 1376–77. The court further stated, "However, if the existence of the predicate acts depends wholly upon a determination that a violation of labor law occurred, jurisdiction is preempted." *Id.* at 1377 (citing *Butchers' Union, Local No. 498, United Food and Commercial Workers v. SDC Inv., Inc.*, 631 F.Supp. 1001 1009–10 (E.D.Cal.1986)).

Other courts have decided differently. In *A. Terzi Prods., Inc. v. Theatrical Protective Union*, 2 F.Supp.2d 485 (S.D.N.Y. 1998), the Southern District of New York refused to find, in whole or in part, NLRA preemption of RICO when labor disputes are involved. *A. Terzi Prods., Inc.*, 2 F.Supp.2d at 502–03 (citations omitted). Reaching its decision, the Southern District of New York relied heavily on the Third Circuit's reasoning in *United States v. Boffa*, 688 F.2d 919, 931 (3d Cir.1982), *cert. denied*, 460 U.S. 1022, 103 S.Ct. 1272, 75 L.Ed.2d 494 (1983). In *Boffa*, the Third Circuit held *Garmon* preemption to apply only to *state* laws that proscribe activity

within the NLRA's exclusive jurisdiction, *not* to other federal laws. *Boffa*, 688 F.2d at 932 (emphasis added). To give the NLRA exclusive jurisdiction at the expense of other existing federal laws would impliedly repeal those federal laws, and there is a "strong judicial policy against implied repeals." *Id.* (citing *Posadas v. National City Bank of New York*, 296 U.S. 497, 504–05, 56 S.Ct. 349, 352–53, 80 L.Ed. 351 (1936)).

 The Court disagrees with *A. Terzi Prods., Inc.* and adopts the reasoning of *Detroit Newspapers* and *MHC.* As the Third Circuit stressed in *Boffa*, there is a strong judicial policy against implied repeals. The Court refuses to find that RICO repealed the NLRA's exclusive jurisdiction over garden variety labor disputes and unfair labor practices. If the act would be unlawful without reference to federal labor law, the act can serve as a predicate offense under RICO. *Detroit Newspapers*, 956 F.Supp. at 761. Nevertheless, if the act becomes unlawful only after referring to the federal labor laws, that act is preempted by the NLRA and cannot serve as a predicate offense under RICO. Additionally, the Court finds this logic most consistent with the following language in *Garmon:* "When an activity is arguably subject to § 7 or § 8 of the Act [NLRA], the States *as well as the federal courts* must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted." *Garmon*, 359 U.S. at 245, 79 S.Ct. at 780 (emphasis added); *see also Garner v. Teamsters, Chauffeurs and Helpers Local Union No. 776*, 346 U.S. 485, 491, 74 S.Ct. 161, 166, 98 L.Ed. 228 (1953).

## III. Analysis

### A. Jurisdiction

The Court possesses jurisdiction over Plaintiff's RICO claim pursuant to 28 U.S.C. § 1333 and 18 U.S.C. § 1964. In addition, the Court has jurisdiction over Plaintiff's pendent State law tort claims pursuant to 28 U.S.C. § 1367.

### B. RICO

#### 1. Proper Parties

The Court begins its analysis by addressing whether the IBT and its officers may be liable for the actions and conduct of members of the alleged RICO Enterprise. Defendants maintain that Plaintiff failed to allege sufficiently that the IBT or any of the twenty-nine individual Defendants conducted or participated in the affairs of an enterprise through a pattern of racketeering activity. Specifically, Defendants argue that the IBT and the individual Defendants cannot be held responsible for misconduct perpetrated by others without somehow linking Defendants to the acts. (Memo. in Support of Def.'s Mot. to Dismiss, Transfer, and Strike at 18.)

 The Sixth Circuit has held that an international union may be responsible for the authorized or ratified actions of its officers and agents. *Falls Stamping and Welding Co. v. Int'l Union, United Auto. Workers, Aerospace & Agric. Implement Workers of America, Region II*, 744 F.2d 521, 526 (6th Cir.1984); *Southern Ohio Coal Co. v. United Mine Workers of America*, 551 F.2d 695, 701 (6th Cir.1977) (citations omitted); *see also* 29 U.S.C. § 106. Similarly, an international union may be liable for the actions of its officers and agents where the international's studied ambivalence toward unauthorized conduct may constitute sufficient inducement, encouragement, and condonation of the conduct. *Southern Ohio Coal Co.*, 551 F.2d at 701 (citation omitted).

There have been instances where the Sixth Circuit refused to hold an international union liable for the actions of its

local agents. In *Shimman v. Frank*, 625 F.2d 80 (6th Cir.1980), overruled on other grounds by *Shimman v. Int'l Union of Operating Eng'rs, Local 18*, 744 F.2d 1226 (6th Cir.1984), local union agents perpetrated the beating of two "dissident members" at a local meeting. The Sixth Circuit counseled against automatically attributing the actions of a local union to its international counterpart. Adopting language from *NLRB v. Int'l Longshoremen's and Warehousemen's Union, Local 10*, 283 F.2d 558 (9th Cir.1960), the *Shimman* court concluded that an international union will be liable if it "authorized," "advised," "sympathized," or "financially supported" unlawful or tortious conduct; "when the international through its constitution or bylaws or by some other means commanded or required the activities;" or "where the international controlled the operations of the local." *Id.* at 95 n. 25.[4] Because the international union's constitution permitted its local unions to govern themselves and left the managing of day to day local affairs to locally elected union representatives and their appointees, the Sixth Circuit refused to impute the acts of the local agents to the international union. *Id.* at 98.

Nevertheless, courts that have specifically examined the relationship between the IBT and its Locals have held the IBT liable for its Locals' actions. In *United States v. International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL–CIO*, 728 F.Supp. 1032 (S.D.N.Y.1990), the Southern District of New York found that the IBT Constitution creates a strongly-centralized union, secure against the weaknesses attending confederations; and that the IBT exercises significant control over its subor-dinate entities. *U.S. v. Int'l Bhd. of Teamsters*, 728 F.Supp. at 1053 (citing *United States v. Navajo Freight Lines, Inc.*, 525 F.2d 1318, 1324 (9th Cir.1975)).

■ In the instant case, Plaintiff did not specifically tie each individual Defendant to individual predicate acts. Nevertheless, Plaintiff asserts that Defendants "have participated in, encouraged, ratified, authorized, conducted, and/or condoned a common course of conduct by and through their agents and officers." (Second Amended Complaint para. 83.) Similarly, Plaintiff alleges, "The RICO Defendants, through their employment by, association with, and organization, control and coordination of, the RICO Enterprise, have engaged in and/or conspired to engage in [numerous predicate acts] ... and have thereby conducted or participated in the conduct of the RICO Enterprise's affairs through a pattern of racketeering activity." (Second Amended Complaint para. 82.) Although the second amended complaint does not go into great detail, it does allude to a coordinated effort on the part of Defendants to force Overnite's acceptance of IBT representation and does more than string a list of entities and racketeering activities together. *Begala v. PNC Bank, Ohio, Nat'l Ass'n*, 214 F.3d 776, 781 (6th Cir.2000); *United States v. District Council of New York City and Vicinity of United Bhd. of Carpenters and Joiners of America*, 778 F.Supp. 738 (S.D.N.Y.1991). Plaintiff may not allege each individual Defendant's role in each predicate act, but Plaintiff's assertions place Defendants on adequate notice of the suit. *See* Fed. R.Civ.P. 8.

The Court's analysis of a motion to dismiss is limited to the pleadings and read in

---

4. The Ninth Circuit found international and local unions frequently to be in adversarial positions. They often engage in lawsuits, internal protests, and complaint proceedings against one another. *United States v. Int'l Union of Petro. and Indus. Workers, AFL–CIO*, 870 F.2d 1450, 1454 (9th Cir.1989).

a light most favorable to the non-moving party. RICO defendants are typically complex, hierarchical enterprises, where the offenses are perpetrated by "underlings" at the direction of distant and removed "bosses." Plaintiff maintains that the perpetrators of many of the predicate acts set forth herein have deliberately disguised themselves and/or taken other measures to avoid identification. (Second Amended Complaint para. 84.) As a result, the Court recognizes the difficulty of linking, with any sort of particularity, the individual defendants and the predicate acts prior to discovery. Therefore, the Court will liberally construe Plaintiff's pleadings, which at the minimum, places Defendants on notice of the crimes. The Court holds that the IBT and the twenty-nine individual Defendants are all properly included defendants.

## 2. Predicate Offenses and Preemption

To prove a RICO claim, the plaintiff must first establish that the defendant committed at least two predicate offenses and that these predicate offenses constitute racketeering activities. Congress enumerates those offenses that will constitute racketeering activities in 18 U.S.C. § 1961.

### a. Hobbs Act

A violations of 18 U.S.C. § 1951, the Hobbs Act, constitutes a racketeering activity under § 1961(1). In its second amended complaint, Plaintiff alleges numerous violations of the Hobbs Act. The Hobbs Act states,

> Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance

of a plan or purpose to do anything in violation of this section.

18 U.S.C. § 1951(a).

Plaintiff asserts that Defendant violated the Hobbs Act by committing extortion. Under the Hobbs Act, extortion is defined as "the obtaining of property from another, with his consent, induced by the wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2).

In *United States v. Enmons*, 410 U.S. 396, 93 S.Ct. 1007, 35 L.Ed.2d 379 (1973), striking employees committed violent acts against their employer including firing high-powered rifles at company transformers and blowing up company property. *Enmons*, 410 U.S. at 398, 93 S.Ct. at 1008. Alleging extortion, the employer sued under the Hobbs Act. The district court dismissed the employer's Hobbs Act claims and the Supreme Court affirmed, finding extortion to involve the "wrongful" obtaining of property. The Supreme Court held that the use of force or violence for legitimate union objectives is not "wrongful" and therefore such conduct does not constitute extortion. The Supreme Court concluded that acts of violence occurring during a *lawful* strike and causing personal and property damage are to be punished by State law not the Hobbs Act. *Id.* at 398, 93 S.Ct. at 1009. Therefore, the applicability of the Hobbs Act depends upon whether or not a strike is "lawful."

Determining whether a strike is lawful will often require an interpretation of the NLRA. In *A. Terzi Prods., Inc. v. Theatrical Protective Union*, 2 F.Supp.2d 485 (S.D.N.Y.1998), a plaintiff brought a claim against a labor union alleging extortion under the Hobbs Act. Significantly, the court found the strike "unlawful" because the union was not the authorized representative of the plaintiff's employees. The

court stated, "It is a basic tenet of federal labor law that a union has no right to demand that an employer recognize or bargain collectively with the union unless it has first obtained the majority backing of that employer's employees and been certified as their bargaining representative." *A. Terzi Prods., Inc.*, 2 F.Supp.2d at 506.

 The instant case poses an issue very similar to the issue addressed in *A. Terzi Prods., Inc.* According to the second amended complaint, the IBT represents only fourteen percent of Overnite's workforce. Section 8 of the NLRA makes it an unfair labor practice for a labor organization or its agents to restrain or coerce employees in the exercise of their right to select their representative. *NLRB v. Local Union No. 103, Int'l Ass'n of Bridge, Structural and Ornamental Iron Workers, AFL–CIO*, 434 U.S. 335, 344, 98 S.Ct. 651, 657, 54 L.Ed.2d 586 (1978) (citing 18 U.S.C. § 158(b)(1)(A)). The NLRA also prohibits unions from picketing an employer where the object is to force the employer to recognize the union as its employee's representative. 18 U.S.C. § 158(b)(7). Therefore, it is clear that the Court must interpret these provisions of the NLRA to determine whether or not the IBT's objective is illegitimate or unlawful. Under the preemption doctrine set forth in *Detroit Newspapers* and *MHC*, if a district court must interpret the NLRA to determine whether conduct is unlawful, the court is preempted. "[I]f there is even a question of whether the predicate acts are protected or prohibited by § 7 or § 8 of the NLRA, that question renders the predicate acts preempted by federal labor law." *Buck Creek Coal, Inc. v. United Workers of America*, 917 F.Supp. 601, 610 (S.D.Ind. 1995). Therefore, the Court concludes that all claims under the Hobbs Act are preempted by the NLRA and should be dismissed without prejudice.

#### b. State Law Extortion

 Whether alleged as a violation of the Hobbs Act or chargeable under state law, extortion is a racketeering activity under 18 U.S.C. § 1961(1). In state penal codes, extortion is typically classified as a crime against property and generally embodies the following two elements: (1) obtaining the property of another (2) induced by the wrongful use of actual or threatened force, violence, or fear. *See, e.g.,* Cal.Penal Code § 518.

Plaintiff casts many of the acts allegedly perpetrated by Defendants through the RICO Enterprise as extortionate, including shooting at Overnite drivers en route, dropping objects on trucks from highway overpasses, throwing or launching projectiles at Overnite trucks and employees, assaulting and intimidating employees, issuing verbal threats, destroying and vandalizing property, following trucks en route and forcing the drivers to pull off the road or take evasive action, issuing bomb threats, and engaging in mob trespass. In each of these instances, Plaintiff seeks to stretch the bounds of extortion by characterizing the right to labor and operate a business free from threats, violence, and fear as a property right, and any deprivation of that right as extortion. Despite ample support of Plaintiff's contentions, *see, e.g., United States v. Arena*, 180 F.3d 380, 394 (2d Cir.1999); *United States v. Debs*, 949 F.2d 199, 201 (6th Cir.1991); *United States v. Santoni*, 585 F.2d 667, 673 (4th Cir.1978), the Court is troubled by the consequences of incorporating such an overly broad interpretation of extortion in RICO. If any coercive conduct on the part of picketers and strikers constitutes extortion, seemingly every "garden variety" unfair labor practice will be swept into the fold of RICO.[5] As a result, an overly broad

---

**5.** Whereas, Congress's specific purpose for enacting RICO was the eradication of orga-

interpretation of state extortion laws will cripple union activity with the specter of treble damages, destroy the delicate balance of labor/management relations forged by the NLRA, and force the federal district courts to police every strike, every picket line, and every labor dispute.

In *United States v. Enmons*, 410 U.S. 396, 93 S.Ct. 1007, 35 L.Ed.2d 379 (1973), the Supreme Court refused to uphold the indictment of striking employees for extortion under the Hobbs Act, even when these employees engaged in significant property destruction. *Enmons*, 410 U.S. at 398, 93 S.Ct. at 1009. The Supreme Court recognized that violence, property damage, and extortion often went hand-in-hand with "lawful" strikes and was willing to exempt such conduct from the debilitating penalties of tough federal laws. In essence, the Supreme Court impliedly recognized the unique circumstances of labor disputes, and the reality that extortion is an integral part of the labor landscape. Any overly broad interpretation of extortion incorporated into the federal laws reaching labor disputes would illegalize all overtly coercive conduct occurring during a strike and destroy the healthy balance forged by the NLRA between labor and management.[6] *Enmons*, 410 U.S. at 410, 93 S.Ct. at 1015. In the light of the Supreme Court's emphasis on the special characteristics of extortion in the labor context, this Court concludes that the restricted scope of extortion under the Hobbs Act is extended to limit similarly the scope of all of RICO's extortion provisions including those under the Travel Act[7] and state law. *See United States v. Thordarson*, 646 F.2d 1323, 1327–28 n. 9 (9th Cir.1981).

The Court finds additional reasons to limit the reach of extortion and RICO. When Congress codified RICO, it did not include "coercion" on the list of enumerated racketeering activities. While extortion is a crime against property, coercion is a crime against the person. According to the Model Penal Code, "A person is guilty of criminal coercion, if with the purpose unlawfully to restrict another's freedom of action to his detriment, he threatens to: ... commit any criminal offense; ...." Model Penal Code § 212.5 (1974). The evolution and expansion of extortion to include the deprivation of seemingly personal rights such as the right to conduct a

---

nized crime, not the revamping of the federal labor law landscape. Organized Crime Control Act of 1970, Pub.L. No. 91–452, 84 Stat. 922, 923 (1970).

6. In a decision following *Enmons*, the Supreme Court held,

> Congress expressly recognized that collective organization of segments of the labor force into bargaining units capable of exercising economic power comparable to that possessed by employers may produce benefits for the entire economy in the form of higher wages, job security, and improved working conditions. Congress decided that in the long run those benefits would outweigh the occasional costs of industrial strife associated with the organization of unions and the negotiation and enforcement of collective-bargaining agreements. The earlier notion that union activity was a

species of "conspiracy" and that strikes and picketing were examples of unreasonable restraints of trade was replaced by an unequivocal national declaration of policy establishing the legitimacy of labor unionization and encouraging the practice of collective bargaining.

*Sears, Roebuck & Co. v. San Diego County Dist. Council of Carpenters*, 436 U.S. 180, 190, 98 S.Ct. 1745, 1754, 56 L.Ed.2d 209 (1978).

7. Plaintiff asserts violations of the 18 U.S.C. § 1952, the Travel Act, as predicate acts under RICO. The Travel Act prohibits using any facility of interstate commerce with the intent to commit any crime of violence to further any unlawful activity. The Travel Act defines "unlawful activity" to include "extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States." 18 U.S.C. § 1952(b).

business has "effectively swe[pt] within its [extortion's] ambit of proscribed acts, not only those activities that the common law conceived of as 'extortion,' but also those that are more appropriately dealt with under the rubric of 'coercion.'" Brian J. Murray, Note, *Protestors, Extortion, and Coercion; Preventing RICO from Chilling First Amendment Freedoms*, 75 Notre Dame L.Rev. 691, 702 (1999). Congress's decision not to include coercion within the enumerated "racketeering activities" indicates a Congressional desire to omit from RICO's coverage conduct that is more coercive than traditionally extortionate. More appropriately, it was safely within the exclusive jurisdiction of the NLRA that Congress placed the prohibition on a union's attempt to "restrain or *coerce*" employees in the selection of their bargaining representative. 29 U.S.C. § 158(b)(1) (emphasis added).

Therefore, the Court dismisses all of the predicate acts alleging extortion under state law and the Travel Act (predicate acts # 56 through # 185L) without prejudice.

#### c. Non–Enumerated Predicate Offenses

 Section 1961(1)(A) specifically enumerates those crimes state law crimes that will constitute a "racketeering activity" under RICO. Those enumerated state law crimes are "any threat involving murder, kidnaping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical." 18 U.S.C. § 1961(1)(A).

Although this list of state law crimes in § 1961(1)(A) is exclusive, *Harvey v. Harvey*, 931 F.Supp. 127, 130 (D.Conn.1996), the Supreme Court calls for the inclusion of other state law crimes falling within the generic designation of one of the enumerated crimes. *United States v. Nardello*, 393 U.S. 286, 293–94, 89 S.Ct. 534, 538–39, 21 L.Ed.2d 487 (1969).

 Assault neither expressly constitutes a racketeering activity under § 1961(1)(A) nor falls within the generic designation of one of the enumerated racketeering activities. *Park South Assocs. v. Fischbein*, 626 F.Supp. 1108, 1114 (S.D.N.Y.1986); *McKinney v. State of Illinois*, 720 F.Supp. 706, 708 (N.D.Ill. 1989) (dismissing the predicate offenses of public indecency, assault, aggravated assault, battery, aggravated battery, intimidation, ethnic intimidation, criminal sexual abuse, aggravated criminal sexual abuse, official misconduct, and compelling confession or information by threat). In the instant case, the predicate acts alleging assault, attempted assault, felonious assault, aggravated assault, aggravated vehicular assault, aggravated menacing, battery, felony with a deadly weapon, criminal recklessness, and reckless endangerment are neither an enumerated racketeering activity in § 1961(1)(A) nor fall within the generic category of any enumerated racketeering activities. Therefore, these predicate acts are dismissed without prejudice.[8]

---

8. Under 18 U.S.C. § 1961(1), only violations of those enumerated state statutes providing for punishment or imprisonment for more than one year will constitute a racketeering activity. Arguing that such offenses are misdemeanors, Defendants challenged Plaintiff's inclusion of violations of Ark.Code Ann. § 5–13–208 (coercion), Minn.Stat. Ann. § 609.224 (assault in the fifth degree), Ohio Rev.Code Ann. § 2903.21 (aggravated menacing), 18 Pa. Cons.Stat. Ann. § 2701 (simple assault), 18 Pa. Cons.Stat. Ann. § 2906 (criminal coercion). The Court dismisses all claims arising under these statutes without further analysis, because they fall within the generic designation of assault or fall within the generic designation of extortion, which the Court has already dismissed.

#### d. Attempted Murder

 Once the Court dismisses Plaintiff's claims arising under the Hobbs Act, the Travel Act, state extortion laws, and state assault laws, the only offenses still remaining to serve as predicate acts under RICO are Plaintiff's claims of attempted murder as alleged in predicate acts # 1 through # 55W. Although "attempted murder" is not an enumerated offense in § 1961, it will serve as a racketeering activity because it falls within the generic designation of murder. *See Nardello,* 393 U.S. at 293–94, 89 S.Ct. at 538–39. In *United States v. Licavoli,* 725 F.2d 1040 (6th Cir.1984), the Sixth Circuit held that conspiracy to murder is a predicate act under § 1961(1)(A) although it is not specifically enumerated. *Licavoli,* 725 F.2d at 1045; *see also United States v. Welch,* 656 F.2d 1039, 1063 n. 32 (5th Cir.1981). In their motion to dismiss, transfer, and strike, Defendants argue that Plaintiff alleges "minor incidents ... that fail to meet the elements of the state attempted murder statutes." (Defs' Memo. in Support of Mot. to Dismiss, Transfer, and Strike at 27.)

Predicate acts # 1, # 2, # 3, # 4, # 5, # 6, # 7 occurring in Mississippi; # 10, # 11, # 12, # 13, # 14, # 15, # 16, # 17, # 18, # 55, # 55E, # 55T occurring in Tennessee; # 19, # 20, # 55G, # 55I, # 55M occurring in Arkansas; # 21, # 22, # 24 occurring in Georgia; # 26 occurring in Iowa; # 27, # 28, # 29, # 31A, # 32 occurring in Texas; # 35, # 36 occurring in Illinois; # 52, # 55D occurring in Minnesota; # 53, # 55W occurring in New York; # 54, # 55O occurring in Kentucky; # 55A, # 55L occurring in Ohio; # 55C, # 55U occurring in Virginia; and # 55J occurring in Kansas, allege that members of the RICO Enterprise fired guns at Overnite drivers in their trucks in transit or threw or launched projectiles at the trucks on the highways or roads. In all of the above-mentioned instances, the alleged acts could constitute attempted murder in their respective state jurisdictions. *See* Ark Code Ann. §§ 5–3–201, 5–10–101, 5–10–102, 5–10–103; Ga.Code Ann. §§ 16–4–1, 16–5–1;[9] 720 Ill. Comp. Stat. 5/8–4; Minn.Stat. §§ 609.17, 609.185, 609.195; Iowa Code § 707.11; Kan. Stat. Ann. §§ 21–3301, 21–3401, 21–3402; Ky.Rev. Stat. Ann. §§ 506.010, 507.020; Miss.Code Ann. §§ 97–1–7, 97–3–19; N.Y. Penal Law §§ 110.00, 125.25, 125.27; Ohio Rev.Code Ann. §§ 2903.02, 2923.02; 18 Pa. Cons. Stat. Ann. §§ 901, 2502;[10] Tenn.Code Ann. §§ 39–12–101, 39–13–202, 39–13–210; Tex. Penal Code Ann. §§ 15.01, 19.02, 19.03;[11] Va.Code Ann. §§ 18.2–25, 18.2–26, 18.2–31, 18.2–32.

 Generally, to plead attempted murder, the Plaintiff must demonstrate an intent to commit the substantive crime and an act toward its consummation. *See, e.g., Stokes v. State,* 92 Miss. 415, 46 So. 627, 629 (1908). Firing upon Overnite drivers en route on deliveries could constitute attempted murder. Firing the gun is the act, and the intent to kill can be inferred from the circumstances. "An inference of intent to kill is raised through the intentional use of any instrument which, based

---

9. Plaintiff inappropriately pleaded a violation of Ga.Code Ann. § 16–10–32 which governs attempted murder or threatening of witnesses in official proceedings.

10. Plaintiff inappropriately pleaded a violation of 18 Pa. Cons.Stat. Ann. § 1102(c), which is a sentencing provision. The Court assumes Plaintiff was referring to § 2502.

11. Plaintiff did not include Tex. Penal Code Ann. § 1902, the general murder provision. Instead Plaintiff only listed § 1903 which is limited to capital murder. The Court assumes this was in error.

on its manner of use, is calculated to produce death or serious bodily injury." *Jones v. State,* 710 So.2d 870, 878 (Miss. 1998); *see also Durham v. State,* 320 Ark. 689, 899 S.W.2d 470, 474 (1995); *Williams v. State,* 262 Ga. 677, 424 S.E.2d 624, 625 (1993); *State v. Wedebrand,* 602 N.W.2d 186, 189 (Iowa Ct.App.1999); *People v. Stokes,* 293 Ill.App.3d 643, 228 Ill.Dec. 566, 689 N.E.2d 625, 630 (1997); *State v. Salcido–Corral,* 262 Kan. 392, 940 P.2d 11, 17 (1997); *Mills v. Commonwealth,* 996 S.W.2d 473, 490 (Ky.1999); *State v. Andrews,* 388 N.W.2d 723, 728 (Minn.1986); *People v. Francis,* 209 A.D.2d 539, 540, 619 N.Y.S.2d 71 (N.Y.App.Div.1994); *In re Mason,* No. 73259, 1999 WL 43315, at *3 (Ohio Ct.App. Jan. 28, 1999); *Commonwealth v. Jones,* 427 Pa.Super. 345, 629 A.2d 133, 135 (1993); *Graham v. State,* 950 S.W.2d 724, 728 (Tex.Ct.App.1997); *Commonwealth v. Hoskins,* No. 6295, 1982 WL 215244 (Va.Cir.Ct. July 21, 1982). Firing a gun at a truck driver on the highway may support the conclusion that the person doing the firing acted with an intent to kill. Similarly, dropping a cinder block from an overpass while a truck is passing beneath at highway speed or throwing a brick or rock at a truck's windshield when it is traveling at highway speed may be found to constitute attempted murder, because a fact finder could reasonably infer an intent to kill from the circumstances surrounding the act. Therefore, the Court finds that predicate acts # 1, # 2, # 3, # 4, # 5, # 6, # 7, # 10, # 11, # 12, # 13, # 14, # 15, # 16, # 17, # 18, # 20, # 21, # 22, # 24, # 26, # 27, # 31, # 31A, # 32, # 36, # 44, # 45, # 52, # 53, # 54, # 55, # 55A, # 55C, # 55D, # 55E, # 55G, # 55I, # 55J, # 55L, # 55M, # 55O, # 55T, # 55U, and # 55W sufficiently allege attempted murder. Similarly, predicate act # 55R sufficiently alleges attempted murder. Under predicate act # 55R, a members of the alleged RICO Enterprise attempted to force an Overnite truck and driver off of a bridge. The unusually dangerous circumstances might lead a fact finder to infer an intent to kill. Under predicate act # 23, one of the members of the alleged RICO Enterprise severely beat an Overnite employee about the head. From those circumstances, a fact finder might infer an intent to kill. Predicate act # 30 states that one of the members of the alleged RICO Enterprise disabled a truck carrying hazardous gas cylinders. From those circumstances, a fact finder might infer an intent to kill. Under predicate act # 9, Plaintiff asserts that one of the members of the alleged RICO Enterprise threw a rock and struck one of Overnite's employees. This predicate act adequately alleges attempted murder, because a fact finder might infer an intent to kill depending on the rock's size and the circumstances. Predicate act # 51 asserts that one of the members of the alleged RICO Enterprise drove dangerously close to an Overnite driver who was changing a tire on the side of the road. From these circumstances, a fact finder might infer an intent to kill.

On the other hand, Plaintiff's allegations that members of the alleged RICO Enterprise swerved in front of Overnite drivers, cut in front of Overnite drivers and forced them to brake hard, and generally forced Overnite driver's to take evasive action on the roads does not meet the requirements of attempted murder under state laws. Under these circumstances, the Court finds that no reasonable jury could infer an intent to kill from such tactics. Therefore, predicate acts # 25, # 33, # 34, # 37, # 38, # 39, # 40, # 42, # 47, # 49, # 50, # 55B are dismissed. Similarly, predicate acts # 8, # 28, # 19, # 29, and # 35 allege that rocks were thrown at trucks, but do not allege that the trucks were traveling at highway speed. No reasonable jury can infer an intent to kill from such circumstances.

The Court also dismisses predicate acts # 46, # 48, # 55F, # 55H, # 55K, # 55N, # 55Q, and # 55R, because they constitute assault, with no special circumstances raising them to the level of attempted murder. In addition, predicate act # 55V is dismissed because it merely alleges property damage.

The Court finds that predicate acts # 1, # 2, # 3, # 4, # 5, # 6, # 7, # 9, # 10, # 11, # 12, # 13, # 14, # 15, # 16, # 17, # 18, # 20, # 21, # 22, # 23, # 24, # 26, # 27, # 30, # 31, # 31A, # 32, # 36, # 44, # 45, # 51, # 52, # 53, # 54, # 55, # 55A, # 55C, # 55D, # 55E, # 55G, # 55I, # 55J, # 55L, # 55M, # 55O, # 55R, # 55T, # 55U, and # 55W adequately plead attempted murder. Attempted murder under these predicate acts survive as racketeering activities. All other predicate acts are dismissed without prejudice.

### 3. Pattern

 Once Plaintiff establishes at least two predicate acts, Plaintiff must demonstrate that these predicate offenses form a pattern of racketeering activity by showing relationship and continuity. *United States v. Blandford*, 33 F.3d 685, 703 (6th Cir.1994) (quoting *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239, 109 S.Ct. 2893, 2901, 106 L.Ed.2d 195 (1989)). Defendants, through the RICO Enterprise, allegedly committed criminal acts against Overnite and its employees for one singular reason, to force Overnite and its employees to accept IBT representation. The predicate criminal acts of attempted murder generally involved the same conduct: firing weapons at Overnite drivers in transit or throwing objects at the trucks' windshields while they passed at highway speeds. The predicate acts of attempted murder were not isolated, random events, but seemingly coordinated acts with the same purpose, victims, and methods of commission. *Id.* Therefore, the second amended complaint meets the Sixth Circuit's test for establishing relatedness.

Once the plaintiff demonstrates relatedness, it must also establish continuity. The Sixth Circuit articulated two types of continuity: "closed-ended," referring to a closed period of repeated conduct extending over a substantial period of time; or "open-ended," referring to past conduct that threatens to project into the future. *Vemco, Inc. v. Camardella*, 23 F.3d 129, 132 (6th Cir.1994).

When Plaintiff's enumerated predicate acts, alleging violations of the Hobbs Act, the Travel Act, state extortion laws, and state assault laws, are disregarded, the remaining predicate acts of attempted murder span from October 26, 1999 to March 16, 2000. This five-month period hardly constitutes a "substantial period of time," *see id.* at 134; *American Eagle Credit Corp. v. Gaskins*, 920 F.2d 352, 354 (6th Cir.1990), thereby ruling out closed-ended continuity. "Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy [the continuity] requirement." *H.J. Inc.*, 492 U.S. at 242, 109 S.Ct. at 2902, quoted in *American Eagle Credit Corp.*, 920 F.2d at 354.

 Nevertheless, Plaintiff indicates that the misconduct underlying the predicate acts of attempted murder threaten to continue into the future, until Overnite "accepts Defendant Teamsters International bargaining demands, or is out of business." (Second Amended Complaint paras. 60, 87.) According to the second amended complaint, an IBT conference call described the IBT's plains to intensify and expand strike activities against Overnite. (Second Amended Complaint para. 87.) In fact, the most recent predicate act of attempted murder alleged, occurred on March 16, 2000 (# 55W), one day before Plaintiff filed its second amended com-

plaint. There is ample reason to believe that Defendants' conduct will "project[ ] into the future with a threat of repetition." *H.J. Inc.*, 492 U.S. at 241–42, 109 S.Ct. at 2902. Therefore, along with relatedness, the Court also finds the continuity necessary to plead a pattern of racketeering activity.

### 4. Enterprise

■■ To establish a RICO violation, a plaintiff must demonstrate that an enterprise existed. Section 1961(4) defines an "enterprise" to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The existence of an enterprise can be shown "by evidence of an ongoing organization, formal or informal, and by evidence that the various associations function as a continuing unit." *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981); *VanDen-Broeck v. CommonPoint Mortgage Co.*, 210 F.3d 696, 699 (6th Cir.2000). A continuing unit exists where there is " 'an organizational pattern or system of authority that provides a mechanism for directing the group's affairs on a continuing rather than ad hoc, basis.' " *United States v. Tocco*, 200 F.3d 401, 425 (6th Cir.2000) (quoting *United States v. Kragness*, 830 F.2d 842, 856 (8th Cir.1987)).

■■ Plaintiff describes the RICO Enterprise as consisting of an association in fact comprised of individuals who are otherwise employed by or retired from unionized competitors of Overnite and activists and allied groups aiding and abetting them, who have been recruited by IBT officials and agents. (Second Amended Complaint para. 30.) Although the second amended complaint does not depict the hierarchy of the RICO Enterprise, it does establish that each individual Defendant occupies a position in the union ranging from general president downward. The second amended complaint also alludes to attempts on the part of the IBT's officers to coordinate Locals' and their supporters toward forcing Overnite to accept Teamsters representation. Therefore, the Court finds that Plaintiff has successfully pleaded an enterprise. Additionally, the Court finds that Plaintiff has successfully alleged the requisite nexus between the enterprise and the racketeering activity and resultant damages. The Court denies Defendants' motion to dismiss Plaintiff's RICO claim.

### C. State Law Tort Claims

### 1. Tortious Interference with Overnite's Business

Defendants also moved to dismiss Plaintiff's claim for the tortious interference with Plaintiff's business. In its second amended complaint, Plaintiff asserts that Defendants, through the commission of the enumerated predicate acts, maliciously, intentionally, and wilfully prevented, interfered with, and otherwise adversely-affected Plaintiff's ability to engage in business relations and contractual relations with various entities and persons. As a result, Plaintiff allegedly suffered damages including lost profits, harm to reputation, and extraordinary expenses involved in securing protection from Defendants' unlawful conduct. Plaintiff petitions the Court for compensatory damages, punitive damages, and treble damages pursuant to Tenn.Code Ann. § 47–50–109.

Asserting the preemption doctrine articulated in *Garmon*, Defendants moved to dismiss Plaintiff's claim. Defendants argue that *Garmon* bars a state from redressing private wrongs that are potentially subject to the exclusive jurisdiction of the NLRA. *San Diego Bldg. Trades Council, Millmen's Union, Local 2020 v. Gar-*

*mon*, 359 U.S. 236, 247, 79 S.Ct. 773, 780–81, 3 L.Ed.2d 775 (1959). Alternatively, Defendants also argue that Plaintiff's claim fails to state a cause of action.

The Supreme Court examined the principles of *Garmon* preemption in *Farmer v. United Brotherhood of Carpenters and Joiners of America, Local 25*, 430 U.S. 290, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977). In *Farmer*, the Supreme Court held that a union member could maintain an action for damages against the union and its officers for the intentional infliction of emotional distress, despite the NLRB's supposed preemption of such labor-related issues. A departure from *Garmon* is permissible when there is "little risk that the state cause of action would interfere with the effective administration of national labor policy." *Farmer*, 430 U.S. at 298, 97 S.Ct. at 1062. Adjudicating a plaintiff's claim for the intentional infliction of emotional distress, a court focuses upon whether the defendant's behavior reaches the requisite level of "outrageousness." Conversely, adjudicating a plaintiff's unfair labor practice claim, the NLRB simply decides whether the defendant's behavior is discriminatory. The tort of intentional infliction of emotional distress targets a particular type of egregious and abusive behavior, above and beyond, any unfair labor practice claim. *See Farmer*, 430 U.S. at 304, 97 S.Ct. at 1065. The higher standard attached to the state tort claim guarantees little interference with the effective administration of the national labor policy. Similarly, in *Linn v. United Plant Guard Workers of America, Local 114*, 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966), the Supreme Court refused to permit NLRB preemption of a state law defamation claim. A statement is defamatory only if it was published with "knowledge or reckless disregard for [its] falsity," whereas the same statement would violate labor practices simply if it were misleading or coercive. *Farmer*, 430 U.S. at 299, 97 S.Ct. at 1063

(citing *Linn*, 383 U.S. at 63, 86 S.Ct. at 663). Once again, the higher standard accompanying the tort claim under state law avoids preemption. The critical inquiry is "*not* whether the State is enforcing a law relating specifically to labor relations or one of general application but whether the controversy presented to the state court is identical to … or different from … that which could have been, but was not presented to the Labor Board." *Sears, Roebuck and Co. v. San Diego County District Council of Carpenters*, 436 U.S. 180, 197, 98 S.Ct. 1745, 1757, 56 L.Ed.2d 209 (1978).

 To sustain a cause of action for interference with a plaintiff's business relations, the plaintiff must establish (1) the existence of a valid business relation (not necessarily evidenced by an enforceable contract); (2) knowledge of the relationship or expectancy on the part of the interferer; (3) and intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted. *Kan Constr. and Cleaning Corp., Inc. v. Tatum*, No. 01A01–9304–CV–00150, 1993 WL 434741, at *4 (Tenn.Ct. App. Oct.27, 1993) (citing 45 Am.Jur.2d Interference 50 (1969)). The plaintiff need not expressly allege malice. It is sufficient to allege "that the damage was done by the defendants intentionally and without legal justification." *Kan Constr. and Cleaning Corp., Inc.*, 1993 WL 434741, at *4 (quoting *Nashville Mem'l Hosp. v. Binkley*, 534 S.W.2d 318, 321–22 (Tenn. 1976), overruled on other grounds by *Lewisburg Cmty. Hosp., Inc. v. Alfredson*, 805 S.W.2d 756 (Tenn.1991)); *contra Testerman v. Tragesser*, 789 S.W.2d 553, 556–57 (Tenn.Ct.App.1989) (citing *Lann v. Third National Bank in Nashville*, 198 Tenn. 70, 277 S.W.2d 439 (1955)). Whereas claims for the intentional infliction of emotional dis-

tress and defamation create higher standards of culpability than their labor law counterparts, Plaintiff's claim for the intentional interference with business relations directly conflicts with provisions of the NLRA. Arguably, most union behavior during a strike is designed primarily and intentionally to interfere with an employer's business. Whether strikes and bargaining tactics interfere unlawfully with an employer's business is to be determined by the NLRB. *Falls Stamping and Welding Co. v. Int'l Union, United Auto. Workers, Aerospace & Agric. Implement Workers of America, Region II,* 744 F.2d 521, 524 (6th Cir.1984). Whereas the Supreme Court concluded that no provision of the NLRA protects the type of outrageous conduct giving rise to a claim for the intentional infliction of emotional distress, *Farmer,* 430 U.S. at 302, 97 S.Ct. at 1064, the Sixth Circuit found,

> Federal labor law clearly permits employees to inflict economic harm on an employer for purposes of collective bargaining. Methods such as striking and picketing, protected by the Norris–La-Guardia Act and the National Labor Relations Act, are intended to cause monetary losses so that compromise or concession becomes a more desirable alternative.

*Falls Stamping and Welding Co.,* 744 F.2d at 524; *see also Buck Creek Coal, Inc. v. United Workers of America,* 917 F.Supp. 601, 609 (S.D.Ind.1995). Permitting this cause of action, arising in a labor dispute context, to be litigated in state courts would disrupt the federal regulatory scheme created by Congress. *See Farmer,* 430 U.S. at 302, 97 S.Ct. at 1064. Therefore, the Court holds Plaintiff's claim for the tortious interference with business relations by the NLRA and dismisses it without prejudice.

### 2. Tortious Interference with Employment Relations

Similarly, any state law claims alleging tortious interference with employment relations are also preempted by the NLRA. In order to recover for the tort of international interference with employment relations, the plaintiff must prove that the defendant intentionally and without justification procured the plaintiff's discharge from his or her employment. *Leemis v. Russell,* No. W1999–00352–COAR3CV, 2000 WL 705772, at *3 (Tenn. Ct.App. May 24, 2000) (citing *Forrester v. Stockstill,* 869 S.W.2d 328, 331 (Tenn. 1994); *Ladd v. Roane Hosiery, Inc.,* 556 S.W.2d 758, 760 (Tenn.1977); *Dukes v. Bhd. of Painters, Decorators & Paperhangers of America, Local Union No. 437,* 235 S.W.2d 7, 10 (Tenn.1950)). Embodying an "intentional" standard, the cause of action will certainly run aground of the NLRA's exclusive jurisdiction. Alternatively, the common law cause of action could also be dismissed for failure to state a claim, because Plaintiff did not allege any discharge. Similarly, because Plaintiff alleged neither a contract with a fixed term of employment nor a breach of that contract, Plaintiff fails to make a prima facie case for damages under Tenn.Code Ann. § 47–50–109.

Therefore, Plaintiff's claim for the intentional interference with employment relations is dismissed.

### 3. Malicious Destruction of Property

In addition, Plaintiff pleads a cause of action for the "malicious destruction of property." Tennessee does not recognize this cause of action, therefore, the Court dismisses the cause of action as pleaded.

## D. Striking Material from the Complaint

Defendants' move to strike material from Plaintiff's second amended complaint concerning "wholly irrelevant and unfairly prejudicial allegations" of past IBT misconduct against Overnite and other employers, dating back to 1945. (Def.'s Memo. in Support of Motion to Transfer, Strike, and Dismiss at 55.) Specifically, Defendants seek to strike paragraphs 33–37, recounting Teamsters attempts to force Overnite to accept Teamsters representation in 1945, 1957, 1977, and 1984; and paragraphs 78–81, citing reports chronicling past Teamsters violence.

■■■■■ A motion to strike is the appropriate remedy for the elimination of redundant, immaterial, impertinent, or scandalous matter in any pleading. 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1380, at 644 (2d ed.1990). Motions to strike are disfavored remedies to be used sparingly only when the ends of justice requires it. *Leaseway Trans. Corp. v. Russell T. Soper*, No. 84 C 8384, 1985 WL 1718 (N.D.Ill. June 13, 1985).

■■■ To establish a pattern under RICO, the plaintiff must demonstrate "continuity." "Continuity" was held to be both a closed-and open-ended concept referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition. The plaintiff may prove continuity by showing a series of past related predicates occurring over an extended period of time. Plaintiff does not include the IBT's 1945, 1957, 1977, and 1984 alleged misconduct as predicate acts, and the Court finds that while the materials may be helpful background information leading to a fuller understanding of the allegations as a whole, it is sufficiently remote to be largely immaterial. *Cf. Leaseway Trans. Corp.*, 1985 WL 1718 at

*3 (citation omitted). Accordingly, such information would be of only marginal relevance.

Therefore, the Court grants Defendants' motion to strike paragraphs 33–37 and 78–81 of the second amended complaint.

## IV. Conclusion

Based on the foregoing, the Court **grants** Defendants' motion to dismiss all of the predicate acts asserting violations of the Hobbs Act, the Travel Act, state criminal extortion statutes, and state criminal assault statutes, without prejudice. Further, the Court **grants** Defendants' motion to dismiss Plaintiff's claims of tortious interference with business relations, tortious interference with employment relations, and malicious destruction of property. The Court **denies** Defendants' motion to dismiss those predicate acts sufficiently pleading attempted murder. Of the 221 predicate acts asserted by the Plaintiff in its second amended complaint, the following 50 predicate acts survive the Court's order and continue to comprise "racketeering activities" in the RICO action: predicate acts # 1, # 2, # 3, # 4, # 5, # 6, # 7, # 9, # 10, # 11, # 12, # 13, # 14, # 15, # 16, # 17, # 18, # 20, # 21, # 22, # 23, # 24, # 26, # 27, # 30, # 31, # 31A, # 32, # 36, # 44, # 45, # 51, # 52, # 53, # 54, # 55, # 55A, # 55C, # 55D, # 55E, # 55G, # 55I, # 55J, # 55L, # 55M, # 55O, # 55R, # 55T, # 55U, and # 55W. The Court **grants** Defendants' motion to strike paragraphs 33–37 and 78–81 from the second amended complaint.